ANDERSON *v.* STATE OF INDIANA

[No. 27,451. Filed March 26, 1941.]

300

*Rochford & Rochford,* of Indianapolis, for appellant.

*Samuel D. Jackson,* Attorney General, and *George B. Davis,* Deputy Attorney General, for the State.

RICHMAN, J.—Appellant is an Indianapolis grocer who in 1939 and previous years filled relief orders issued by the trustee of Center Township in said city. A grand jury on December 1, 1939, found an indictment in two counts, the first charging appellant with having filed a false claim under § 10-2101, Burns' 1933, § 2745, Baldwin's 1934, and the second with having by false pretense obtained the signature of the trustee "to a certificate as to the correctness of a certain pretended claim in writing against said Center Township, . . . of the value of four and 05/100 ($4.05) dollars," this count being based on § 10-2103, Burns' 1933, § 2747, Baldwin's 1934.

After hearing evidence on a plea in abatement charging noncompliance with statutory provisions for selection of the grand jury, the court overruled the plea. A motion for change of venue from the county was overruled. A jury trial resulted in appellant's acquittal on the first count and conviction on the second. Motion for new trial was overruled. From the judgment sentencing appellant in accordance with the verdict this appeal is taken. Of the errors assigned three are relied upon.

First is alleged error in overruling the plea in abatement. It appears that two grand jurors were selected from one panel of fifty, four from a second panel of fifty, and that two vacancies later occurred, which were filled from a third panel of twenty-five. In each of the first two instances the clerk of the court failed to comply with certain provisions of § 4-3320, Burns' 1933 (Supp.), § 1267-1, Baldwin's Supp. 1937, the same being § 1 of "An Act concerning proceedings in criminal and civil cases." Acts 1937, ch. 156, p. 839. In the third, he did not strictly follow § 2-2004, Burns' 1933, § 328, Baldwin's 1934.

The departures from statutory procedure were that the clerk failed at the time of the first drawing then to enter the names drawn on the order book, that the second drawing did not have two full days' notice, and that in the third, the clerk's entry was delayed. All matters were of record, however, on September 5, 1939, except the clerk's certificate to the last entry. The plea in abatement was filed December 8th, and thereafter upon the order of the court the clerk's certificate to the record of the third drawing was entered as of the date of the drawing. In his plea setting up those irregularities appellant asserted by way of conclusion that they were probably harmful to his substantial rights but the evidence taken on the plea went no further than to show the irregularities. He asserts further that he had no way of knowing that the members of the grand jury were the persons actually drawn or that vacancies did exist and the jurors substituted were the persons actually drawn for that purpose. He relies chiefly on *Dale* v. *State* (1928), 200 Ind. 408, 164 N. E. 260, which enjoins strict compliance with the statute, while appellee points to § 2 of the 1937 Act as curing the irregularities.

The probable purpose of the clerk's certificate required by § 2-2004, *supra,* was as a check to insure the accuracy of the record by one of the three persons participating in the drawing. The other provisions not strictly followed herein were by way of notice to the public and particularly to those bound over to or knowing themselves to be likely subjects of inquiry by the grand jury, so that seasonably they might protect their interests by challenge or otherwise.

Appellant disclaims any interest in this grand jury until notified of the indictment. At that time and for almost two months prior thereto all the records spoke

the truth and were complete except for the certificate, which added nothing to the record except the clerk's verification. The delay of a few days in recording, the short notice of the second drawing, and lack of certification, while not to be commended as a practice for clerks, did not harm appellant in any way, substantial or otherwise, so far as he has shown.

At least since 1889 the rule in Indiana has been as stated by Judge Mitchell in *Cooper* v. *State* (1889), 120 Ind. 377, 379, 22 N. E. 320, as follows:

> "The intervention of mere irregularities in drawing and organizing the grand jury, which involve no charge of fraud or corruption, and which in no way prejudice the substantial rights of the defendant, assuming, in the absence of anything appearing to the contrary, that the body as constituted was composed of persons duly examined and qualified, and not subject to any of the statutory causes of challenge, is not available as a plea to abate the indictment. Whart. Cr. P. and Pr. (9th ed.), section 350; *State* v. *Mellor,* 13 R. I. 666."

Judge Mitchell in *Sage* v. *State* (1891), 127 Ind. 15, 26 N. E. 667, states the same rule in other language and cites as additional authorities *Commonwealth* v. *Brown* (1888), 147 Mass. 585, and *Hardin* v. *State* (1864), 22 Ind. 347. The latter is based upon a statute, 1 R. S. 1852, p. 433, 2 R. S. 1876, p. 419, § 12, which disappeared from our compilations of statutes after 1876 but, *Stipp* v. *State* (1918), 187 Ind. 211, 118 N. E. 818, to the contrary notwithstanding, may still be in force. See *Williams* v. *State ex rel. Gudgel* (1882), 86 Ind. 400, 402. That statute merely expressed the legislative intent that the act of which it was a part should be directory. The same thing is true of § 2 of the Act of 1937. When a court has ascertained that intent, the determination of the effect of such legislation upon the

rights of the parties in litigation is a judicial not a legislative function. This no doubt was understood by the eminent judges who wrote the opinions in the Cooper and Sage cases, *supra,* and, while the statute was cited in the briefs, the opinions put the rule on a judicial not a statutory basis. So whether or not § 12 of the Act of 1852 survived the repeal of the remainder of the Act is an academic question.

The courts of Indiana have always protected persons charged with crime, upon their seasonable objection, against any interference with their substantial rights occasioned by improper organization of the grand jury. All the cases cited by appellant and those to which reference is made therein may be supported on the facts disclosed in the records and we have found none, including the Dale case, *supra,* which was reversed because of irregularities not harmful to the appellant.

In *Jones* v. *State* (1832), 3 Blackf. 37, the jury was selected by the board "at their own discretion" without any compliance with the statute. *Mitchell* v. *Denbo* (1833), 3 Blackf. 259, shows that the clerk *never* recorded the list of jurors. Both of these cases involved petit juries, although in the latter, at least, the same statutory procedure was prescribed for the selection of grand juries. The issue was so framed on pleadings in *Vattier* v. *State* (1835), 4 Blackf. 73, that this court had to assume that the statute was not followed in any respect. In *State* v. *Herndon* (1839), 5 Blackf. 75, one grand juror was not a freeholder or householder as required by the statute. In *Shattuck* v. *State* (1859), 11 Ind. 473, the question was whether the presence of a prosecuting attorney had improperly influenced a grand jury after it had been organized and sworn.

*Stipp* v. *State, supra,* strongly relied upon by appellant, shows that no attempt was made to follow the statute but the bailiff was sent to get a person chosen by the judge to fill a vacancy.

In *Walter* v. *State* (1935), 208 Ind. 231, 236, 195 N. E. 268, 98 A. L. R. 607, it was held that jury commissioners have no power "to exclude from jury service a class of citizens (women) that the legislature has included among those eligible." Here a petit jury was in question.

A plea in abatement was sustained in *State* v. *Bass* (1936), 210 Ind. 181, 1 N. E. (2d) 927, where it appeared that names selected by former jury commissioners were left in the box when the new names were placed therein, that the box was left in an exposed place where names could easily be placed therein, that the name of one of the jury commissioners was twice drawn when it could not properly have been in the box, and that two of the names drawn were of persons who had been active in a movement to call this grand jury to investigate the matters in which the specific indictments were returned.

*Souerdike* v. *State* (1938), 214 Ind. 523, 15 N. E. (2d) 379, also cited by appellant, involved the drawing of a petit jury and it is shown that the court ordered a secret drawing of a special venire especially directing the clerk, commissioners and the sheriff, who was the prosecuting witness, that the names of the talesmen be not furnished either to the state or defendant until the sheriff made his return on the special venire. We stated that this was improper but held that the objection was waived because not presented at the proper time.

In the Dale case, *supra*, the opinion does not state all the facts. From the plea in abatement held good therein we quote as follows:

"That no list of any names drawn for the January Term, 1923, of said Court grand jury, was by the clerk of said court nor by any one else at any time entered on the Order Book of said Court, nor was there any such list at all; and the said Clerk of said Court did not at any time make and certify to any list of names whatever on the Order Book of said Court, as the names of the grand jurors chosen, selected and drawn for service on the grand jury for the January Term 1923, of said Court. That there is not now and never was at any time, at any place in the records of the said Delaware Circuit Court at the time of the filing of this plea in abatement any record or Order Book entry of said Court or the Clerk thereof, showing the composition in this cause, except such record as was made after the return of the pretended indictment in this cause and that such record shows only the filing of the final report of said pretended grand jury."

Other cases examined include *State* v. *Sutherlin* (1905), 165 Ind. 339, 75 N. E. 642; *Fenwick* v. *State* (1926), 197 Ind. 572, 150 N. E. 764; *Randolph* v. *State* (1928), 200 Ind. 210, 162 N. E. 656; *Crickmore* v. *State* (1938), 213 Ind. 586, 12 N. E. (2d) 266. In all the cases herein cited where substantial injury was seasonably shown the objection of the person whose rights were affected was sustained by the court. In matters where the statute was held to be directory only and the accused was not prejudiced the principle stated by Judges Elliott and Mitchell was followed. The Rhode Island and Massachusetts cases relied upon by them do not "invoke a rule which is of legislative origin." We are satisfied with the rule whatever its origin. It is in harmony with the views of other courts and legisla-

tures.  See 28 C. J. 773, 774; 24 Am. Jur. § 19, p. 845. The plea in abatement was properly overruled.

The next alleged error is the overruling of appellant's motion for change of venue from Marion County. If any question is presented by appellant's ██ sketchy treatment of this proposition in his brief, the answer is found in *Sammons* v. *State* (1936), 210 Ind. 40, 199 N. E. 555, holding that in such matter the trial court exercises a discretion which unless abused is final.  A further ground stated is that the trial court's finding on contradictory evidence will not be disturbed. The record contains 321 pages devoted to this motion, with supporting and counter-affidavits, 59 pages containing prints of photostatic copies of newspaper items as to alleged relief frauds, pictures, and records, including purchase orders on which this prosecution is based. Appellant submitted 67 affidavits, alike except as to signature, and the prosecuting attorney 178 similar affidavits, the former asserting that appellant could not and the latter that he could have a fair trial in Marion County.  He claimed that Indianapolis newspaper and radio publicity had aroused such prejudice that he was entitled to be tried in one of the adjoining counties. The state argued that the citizens of those counties generally read Indianapolis newspapers and listened to news broadcasts from Indianapolis radio stations so that an unprejudiced jury was as likely to be obtained in Marion as in any adjoining county.  If this was the trial court's conclusion we cannot say he was wrong although it is not much consolation to one complaining that he cannot get a fair trial in his own county to tell him that his case has been thoroughly advertised to his prejudice in any place to which it may be taken. In any event the record does not disclose an abuse of the court's discretion.

On the third error assigned, the sufficiency of the evidence to sustain the verdict, we have carefully read a very large record from which we state the following facts material to the issues which we deem controlling.

Thomas M. Quinn in 1939 was trustee of Center Township, which included business and residence portions of Indianapolis. He had about 118 employees and deputies. In administering poor relief the regular procedure was substantially as follows: An applicant for relief, upon investigation, sometimes cursory, was assigned a case number which with his name, address and designated amount of relief per week was placed on a buff ledger card in the "intake" department. The recipient received an identification card with like information thereon. The buff cards went to the bookkeeping department and were assigned alphabetically to purchase order writers. No purchase orders were written except from the ledger cards. These orders, usually written weekly, were on forms prescribed by the state board of accounts and, so far as here material, contained the date, the number of the order, the name of the merchant to whom addressed, a direction to supply the recipient, naming him and giving his address and case number, with food of a designated cash value. Then came the words: "Authorized by Thomas R. Quinn, Township Trustee," Quinn's name sometimes being written in by a deputy or placed thereon by facsimile stamp. Beneath this authorization were the words "Vendor's statement: I have furnished the customer with the full amount of supplies or other items authorized by this order," with a blank thereunder for the merchant's signature. Also on the face of the order were these words: "Customer's Receipt: I have received in full the items authorized by this order," with a blank for the recipient's signature. On the reverse

side of the order was a grocery list with prices designated by the trustee and blanks for quantities and total amount of each item furnished and a blank for the sum total which was supposed to correspond with the amount authorized by the order. These purchase orders were made in triplicate, a yellow copy retained in the trustee's files, a pink copy going to the county auditor to be used for checking, and a white or original copy going to the merchant.

Appellant was one of 62 approved grocers to whom orders were issued. It does not appear that he had any connection with the purchase orders until they were picked up at the township office or delivered to his grocery and when so received by him each order had the trustee's signature of authorization. To obtain groceries the recipient of relief presented his identification card, with name, address and case number thereon, to appellant or one of his clerks. No photograph, signature or other means of identification was required by the trustee's system. If appellant had a purchase order bearing name, address and case number corresponding with the identification card presented, the groceries were delivered and the purchase order receipt signed by the recipient "customer."

Periodically appellant signed all filled purchase orders in his possession, listed them on form sheets provided for that purpose containing blanks for the date of purchase, order number, recipient's name and amount of order. On each sheet were spaces for listing 42 orders. At the bottom of each sheet was the form of an affidavit for execution by the merchant to the effect that "the foregoing claim in the sum of $_____ is true and correct; that the Township has received the full value and the exact consideration therein named; that the prices

therein charged are in accordance with contract or statute"; and that the claim has not been paid.

Exhibit 13 includes 12 of these sheets, each one signed by appellant, and the last one with the trustee's authorized signature to the jurat. These 12 sheets listing 490 purchase orders evidently were contained in a cover on which appears the following: "I certify that the within claim is true and correct; that the supplies and materials therein itemized and for which charge is made were necessary to the public business; that each and every item has been delivered at prices mentioned, and was in accordance with contract, except _____ _____ and hereby certify the sum of $1,263.25 is due claimant. Thomas M. Quinn, Trustee of Center Township. July 29, 1939."

To the claim so prepared appellant attached all the completed purchase orders therein listed and after the trustee had affixed his signature to the certificate last quoted, the claim went to the county auditor, where it was checked and, being found correct, warrant was issued for the total amount, which in due course was paid by the county treasurer and charged to the township poor relief account.

The controversy seems to center around Exhibit 1, which is a purchase order numbered 68546, dated "7/10" 1939, issued to "Anderson" directing him to supply Melvin Woodson, 620½ E. Market, Case No. 32473, with food, $4.05. Exhibit 2 is of the same tenor except that it is numbered 67802 and dated "7/3." With all the signatures thereon each was attached to Exhibit 13, in which they were listed. This exhibit, listing also 2 purchase orders each for Wm. Searcy, Chas. Towden (there is some dispute about the last name), and Jos. Telles, with 490 purchase orders attached regularly signed by appellant and containing

the purported signatures of 262 "customers" named, was certified as correct by the township trustee and warrant for $1,263.25 duly issued and paid to appellant. Exhibit 18, a later claim for $1,642.30, listed 640 purchase orders including two each for Searcy and Towden. There was testimony that a search in the trustee's files for the buff ledger cards for the four individuals named was unavailing. There was sufficient evidence of inability to locate either of them at the addresses given or in the neighborhood, from which the jury might reasonably have drawn the inference that the names were fictitious. Appellant and his clerks testified, and there was no evidence to the contrary, that no orders were ever listed unless groceries of full value had been delivered and that no orders were ever filled unless some one answering to the "customer's" name, presenting an identification card with such name, address and case number, signed the purchase order on receipt of the goods or, in the case of illiterates, authorized some one so to sign the customer's receipt.

The trustee testified on cross-examination that so far as he knew the orders introduced in evidence were all bona fide purchase orders addressed to appellant and to a genuine relief recipient and that they were made out in his office but not by him. Appellant testified on direct examination as a witness in his own behalf that in May, 1939, he was told that "somebody" was cashing false orders at one of his two stores and he told the trustee that "I thought we ought to check his office on that, there was something wrong down there," but he said "Go ahead sonny, it will take care of itself." Thereafter there were no more complaints of false orders. Appellant was not cross-examined on this subject.

As stated in the beginning the first count of the indictment was for making a false claim. A copy of

Exhibit 1 was set out in the indictment as the "claim" which was false. On this count appellant was acquitted, possibly because the jury did not consider this exhibit to be a claim.

The second count charged that appellant "on or about the first day of August, A. D. 1939, did unlawfully, feloniously, knowingly and falsely pretend" to the township trustee "with intent . . . to cheat and defraud" the township "by then and there obtaining from said Thomas M. Quinn as such trustee, his signature to a certificate as to the correctness of a certain claim in writing against said Center Township, then and there of the value of four and 05/100 ($4.05) dollars, by . . . falsely pretending that he had delivered to Melvin Woodson, . . . certain food . . . as shown by said pretended claim against said Center Township" whereas he had not so done, "which was then and there well known to said Dan R. Anderson," that the trustee relied upon the false pretense believing it to be true and by reason of such reliance and belief signed the written certificate to the correctness of the claim to the damage of the township in the sum of $4.05.

Appellant's argument in this court proceeds on the theory that the "claim" referred to in the second count is the same as the one on which the first count is based, namely Exhibit 1, and that there is a failure of proof because the trustee's signature thereon antedated the delivery of the purchase order to appellant and was therefore not procured by any representation made by him. There is some justification for this contention inasmuch as the "claim" is described in this count as being for $4.05, in which amount the township is alleged to have been damaged. The trustee's only signature to the correctness of a claim is on Exhibit 13, a claim not for $4.05 but for $1,263.25. This amount

includes two items of $4.05 each for groceries alleged to have been delivered to Melvin Woodson by appellant, either one of which is within the issue raised by the indictment. The only difference between them is that one is dated "7/3," the other "7/10." The question actually raised is whether there was a material variance but as this subject has not been discussed in the briefs it need not be decided, particularly as in other respects we deem the evidence insufficient to sustain the verdict.

If it be conceded that Woodson, Searcy, Towden and Telles were not actual persons but merely fictitious names it necessarily follows that there was fraud or gross negligence in the trustee's office. There the purchase orders were written, Exhibit 1 by Dorsey Greer, Exhibit 2 and six others by Martin Seagle, and two others by Paul Kiefer, each of whom testified that the orders written by him were bona fide and authorized by a ledger card before him in the files when the order was written. Greer testified that he wrote Exhibit 1 from a ledger card given him by John Neenan, first order clerk. There was other evidence that Neenan and his assistant Pat Kelleher made out the ledger cards. Neither Neenan nor Kelleher was called as a witness.

If either of them or the trustee or some other unnamed employee of the trustee fraudulently or negligently was responsible for issuing the orders with the fictitious names, the fraud so conceived could have been consummated in one of three ways. The first was by the co-operation of the merchant in signing the vendor's certificate, knowing that he had delivered no groceries on the orders and benefiting to the extent of the purchase price of the order. Second, the guilty employee of trustee could have sent someone not known by the merchant or his clerks to get the groceries by repre-

senting himself to be the recipient named in the purchase order. In the first of these methods the merchant himself must have co-operated because only he, not his clerk, would benefit if no goods were in fact delivered, unless, of course, the clerk was a party to the scheme to defraud. By the second method the groceries received on the purchase order would have had either to be consumed by the recipient who signed the fictitious name or be disposed of by him to realize the cash for division with his confederate in the trustee's office. There is no evidence in the record directly pointing to the use of either method, unless it be found in the circumstances hereinafter discussed. In the third instance the impostor might procure the issuance of ledger and identification cards by the negligent trustee and present them in the ordinary course as authority for filling orders issued by the trustee to the unsuspecting merchant. Here no criminal liability could be asserted against appellant unless he knew that the man presenting the card was an impostor. So if appellant is to be held for any of the three methods of consummating the fraud, his guilty knowledge must be proved.

The falsity of appellant's representation that he had "furnished the customer with the full amount of supplies of other items authorized by this order" apparently is assumed. The reasoning seems to be: Melvin Woodson was the customer named in the order. From negative testimony it is inferred that there was no person named Melvin Woodson. There being no such person, no goods could have been furnished to him. Therefore the statement that goods had been furnished to him was false. We do not think this a necessary or proper conclusion.

It must be remembered that no separate identification of the customer was required by the trustee's pre-

scribed method of doing business. When an identification card was produced purporting to be issued to a Melvin Woodson, 620½ E. Market, Case No. 32473, appellant, having a purchase order with that name, address and case number, was authorized to fill the order upon obtaining the "customer's" signature to receipt for the goods ordered. So when appellant signed the "vendor's statement" on the purchase order he represented no more than he was required to know with respect to the identity of the recipient, namely, that he had delivered $4.05 worth of groceries to a man claiming to be Melvin Woodson, residing at 620½ E. Market St., Case No. 32473, who had signed the customer's receipt in that name. In order, therefore, to prove that the representation was false there must be some evidence besides the fact that the name was not that of a bona fide applicant for relief. Appellant must be shown to have known the name was fictitious.

Knowledge of the falsity of the representation was also a fact essential to conviction. In this case the same evidence that would prove falsity would also prove knowledge, for the essence of the falsity was knowledge that the name Melvin Woodson was fictitious.

The evidence which is relied upon to prove such knowledge is the fact that three other persons for whom appellant had filled purchase orders did not exist. That each of them was a fictitious name must be inferred from the same negative kind of testimony referred to with respect to the existence of Woodson.

It is obvious that no one could logically conclude from the fact that Woodson did not exist that appellant knew that fact. So also as to each of the others. The process of reasoning involved is of a different type, namely, that, because there were four fictitious names, with two orders for each, or eight fictitious orders among the

490 orders included in appellant's claim (Exhibit 13), and four more in 640 listed in Exhibit 18, a claim filed two weeks later, it was quite unlikely that they were accidental or inadvertent but on the contrary must have been intended or planned. If this premise be conceded, there remains the further stage in the deduction, namely, that appellant was the author or knew of the plan. Is this sound reasoning?

In 2 Wigmore on Evidence (3rd Ed. 1940), beginning with § 300 at p. 192, the author exhaustively treats the probative value of evidence of other transactions or offenses on the question of intent, design, and knowledge, where one or the other is the issue in the case being tried. Without quotation we state the substance of his conclusions so far as here material.

From the mere recurrence of similar transactions it may be inferred that they were not accidental or inadvertent but were intended by someone. So when it has first been proved by independent evidence that the accused did the act for the intentional doing of which he may be punished, then the other transactions are admissible in evidence to prove his intent even though his connection with them has not been proved.

Likewise similar transactions may be shown to prove design or plan on the theory also that their occurrence was not accidental but indicated an intelligent source. From the design so shown it may be inferred that the act carrying out that design was committed by the one who conceived the plan. But here the similar transactions may not be anonymous but must be connected by independent evidence with the person accused. Then they may be used to prove that he did the act carrying out the plan so conceived.

In proving knowledge the similar transactions must be of such a nature as necessarily to charge the person involved in those transactions with guilty knowledge of their character.  And before they have any probative value in the case being tried it must first be shown that the accused did the act for which he is being tried.  After such proof is made, guilty knowledge may be inferred from the previous guilty knowledge accompanying the other acts.

Applying those principles and bearing in mind that knowledge is the mental condition here involved it is apparent that evidence of the non-existence of the three, Searcy, Towden and Telles, does not tend to prove that appellant knew Woodson did not exist, for nothing is shown to charge appellant with knowledge that either of the other three was a fictitious name.  The investigation made by the state and shown in evidence is not proved to have been brought to appellant's attention until after he made the claim the signature to which he is alleged to have procured by false representation.

Directly in point is the case of *United States Life Insurance Co.* v. *Wright* (1878), 33 Ohio St. 533, 536, where the action was to rescind a life insurance contract and recover the premium paid on the ground that it was procured by false representations of the agent. Following is an excerpt from the opinion:

"3.  On the trial, the plaintiff below, testified that the agent of the company made the representations, as stated in the petition, upon which the applications for the policies were made.  He was also allowed, against the objecton of the company, to prove, by other witnesses, that the agent, to induce them to make application for insurance in the company, made similar representations to them. To the admission of which the company excepted; and also, before the close of the trial, moved the

court to withdraw it from the consideration of the jury.

"This evidence was admissible for no other purpose than to show that the representations made to the plaintiff were known by the agent to be false. There was, however, no evidence given tending to show that the statements made to others were false, or known by the agent to be untrue. The evidence, then, afforded no light upon the point on which alone it was admissible; and therefore should have been ruled from the jury."

The facts of an early Indiana case, *McCartney* v. *State* (1852), 3 Ind. 353, sustain this principle. The appellant was being tried for passing forged bank bills. Evidence was admitted that he had passed other such bills. To show his state of mind, i. e. guilty knowledge, on the other occasions, what he then said was admitted as a part of the *res gestae*. Although the court does not seem to have made the distinction, without such evidence or other evidence charging him with knowledge at the time the other acts were committed, the acts themselves would not have tended to prove his guilty knowledge at the time of doing the later act which brought him to trial.

We think if the cases relied upon by appellee are analyzed they will be found in harmony with the principles which we have been discussing. In *Lund* v. *State* (1934), 207 Ind. 347, 352, 353, 190 N. E. 850, a township trustee was tried for filing false claims. Certain orders for poor relief, found in his files and therefore deemed to be within his knowledge, were admitted in evidence over his objection. One of them, at least, showed that relief had been authorized for a less amount than that for which the claim was made. This court held that there was no error for they might "be considered by the jury upon the question of whether or not appellant had knowledge of the falseness of the

claim filed, and intended to defraud the township." Other claims filed by the trustee and not related to the claim which was the basis of the indictment were held properly admitted, the court saying:

> "*It having been shown that the claim filed was false,* intent and guilty knowledge may be proven by evidence of other or similar offenses." (Our italics.)

But in the case at bar the falsity was not proved by independent evidence but was one of the two issues depending for proof upon the evidence under consideration.

*Nordyke* v. *State* (1938), 213 Ind. 243, 11 N. E. (2d) 165, is the only other case cited by appellee. The second point on p. 247 of the opinion shows that there was adequate independent evidence connecting the appellant with the fraud so that other "spurious orders" (p. 252) were properly admitted "for the purpose of characterizing the conduct of appellant, and proving criminal intent."

These views have support either in the facts disclosed or the opinions expressed in *Kahn* v. *State* (1914), 182 Ind. 1, 105 N. E. 385; *Underhill* v. *State* (1916), 185 Ind. 587, 592, 114 N. E. 88; *Clevenger* v. *State* (1919), 188 Ind. 592, 125 N. E. 41; *Zimmerman* v. *State* (1921), 190 Ind. 537, 130 N. E. 235.

The only other evidence which might be considered pertinent is the conversation concerning false orders in May between the trustee and appellant. We do not think the jury might reasonably have drawn the inference therefrom that appellant knew the orders to Woodson two months later were fraudulent. The answer of the trustee would have tended to allay any suspicion appellant may have then had. At least it did not cast the burden upon him to

make independent investigation as to the bona fides of each of the thousands of purchase orders beyond that required by the trustee's method of doing business.

It was shown that appellant and the trustee were friendly, frequently had luncheon together and saw each other every day; but these facts require no imputation of fraud, particularly as the trustee's own testimony as a witness for the state disclosed no acquaintance with any of the facts upon which fraud is predicated.

We are unable to find any evidence in the record from which the jury might properly and reasonably have drawn the inference that appellant's representation was false or known by him to be false, each of which was a fact necessary to be found before appellant could be convicted.

The judgment is reversed with direction to grant a new trial.

NOTE.—Reported in 32 N. E. (2d) 705.