**Lewis T. WIREMAN, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

**No. 2–1277A480.**

Court of Appeals of Indiana, Fourth District.

April 6, 1981.

Rehearing Denied June 16, 1981.

Harriette Bailey Conn, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, R. Davy Eaglesfield, Sp. Deputy Public Defender, Indianapolis, for appellant.

Theodore L. Sendak, Atty. Gen., Victoria R. Van Duren, Deputy Atty. Gen., Indianapolis, for appellee.

MILLER, Judge.

Lewis T. Wireman was convicted by a jury of theft and burglary. Although he raises numerous issues for our consideration on appeal, we find it necessary to discuss only one, since it is our ultimate conclusion Wireman's conviction must be reversed on this question alone. In particular, we conclude the trial court should have granted Wireman's motion to dismiss his initial indictment due to irregularities in the grand jury selection process.[1]

Significantly, the State does not dispute the essential factual bases of these challenged practices. By way of background to our consideration of such facts, we initially observe that Wireman had served as city judge for the City of Lafayette from 1972 until the end of 1975, after which the grand jury returned its indictment against him, and that the alleged criminal acts with which he is charged occurred while he was employed in that capacity.[2] We also note the grand jury which indicted him had generally been charged by prior court order with the responsibility of assisting a special prosecuting attorney[3] in his investigation of "certain allegations [which] have been publicly made concerning possible criminal conduct by public officials and concerning the possible commission of crimes which have not been properly investigated or prosecuted. . . ." That court order, dated October 22, 1975, noted that among the public allegations to be considered was the charge the regular prosecuting attorney "has been influenced in the conduct of his office by political considerations."

With respect to Wireman's attack on the grand jury selection procedures, the following essentially unchallenged evidence was elicited at a hearing on his motion to dismiss: In December of 1975, and early January of 1976, the grand jury which returned the indictment against Wireman was formed by drawing two panels of names

1. We do not discuss all of the irregularities which were alleged, since we conclude those based on the authority of the jury commissioners and the calling of prospective jurors out of order have been comprehensively considered by this Court in *Bagnell v. State*, (1980) Ind. App., 413 N.E.2d 1072, and that discussion of these questions (as well as other challenged practices) is not essential to our resolution of the case at bar.

   One issue which we do not discuss in detail concerns the practice, acknowledged by the trial court judge, of informally excusing prospective jurors from appearing for service where such service would be inconvenient or impossible for them to perform. In *Porter v. State*, (1979) Ind., 391 N.E.2d 801, a similar procedure (in which the bailiff skipped over names of persons who could not be contacted by phone or who had some reason for not serving), though not condoned, was not found to constitute reversible error where there had been no showing of a systematic exclusion of any juror or group of jurors.

2. In this regard we also observe Wireman's performance in office was the subject of a disciplinary action, *In re Wireman*, (1977) Ind., 367 N.E.2d 1368, in which action Wireman was disbarred as an attorney in Indiana for conduct including acting as a judge in matters involving his own clients, encouraging a client and others to perpetrate first-degree burglary, and receiving stolen property.

3. For a discussion of the circumstances surrounding the appointment of this special prosecutor see the majority and dissenting opinions in *King v. State*, (1979) Ind.App., 397 N.E.2d 1260, 1274.

from an appropriate jury box. Significantly, while the names were placed in the box and drawn from it with both of the commissioners (and the county clerk) being present, each commissioner acted individually in selecting and preparing the pool of names which later were put into the box. Names had been added to the box as recently as November of 1975, and on several other occasions during the year.[4] Apparently, it was a common practice in Tippecanoe County at that time for names to be added to the box as it became "depleted," although the evidence reveals the box was never actually exhausted of names. In fact, at least during the several years preceding the drawing of the grand jury in question, no effort had been made to purge old names from the box. One jury commissioner, Emil Ebner, testified that during his six years of service ending in December of 1975 he had never had occasion to "completely empty the box in which the names are deposited," and a current commissioner, Robert Brown, testified merely that "perhaps one time in about 19—sometime in 1974 I think we were down to three or four names. . . ."

Most significant to our opinion is the *source* of the unpurged names remaining in the jury box at the time Wireman's grand jury was drawn. It was uncontradicted these names were selected by the jury commissioners, acting individually, from (among other sources) voter registration records which clearly indicated the political affiliations of the prospective jurors.[5] In this regard, commissioner Ebner acknowledged this practice on his part may have continued until the middle of 1975 and thus

that such records may have been used, for example, as late as the June, 1975, deposit of names in the box. Similarly, commissioner Brown, who was appointed in 1973, also testified he used the politically-labeled lists through the spring of 1975. In addition, at the special hearing on April 30, 1976, a voter registration officer who had observed the commissioners at various times as they selected names for the jury box also testified it was not until "six or nine months ago" that the commissioners began using a master voter registration list which did not disclose political party. Thus, it was established the potential grand jury members were selected from a jury box which had not been purged for a substantial number of years of names selected from politically-labeled voter lists.

Admittedly, there was no specific showing that the foregoing practices resulted in a politically biased or otherwise prejudicially constituted grand jury. Thus, no attempt was made, for example, to reveal the political affiliations of any jurors, grand or petit, whose names were drawn from the box, for the purpose of demonstrating any disproportionality based on politics. However, Wireman's attack on such practices and any other alleged irregularities proceeds not from any actual demonstrated harm, but on an alleged substantial departure with the policies expressed in the language of the applicable statutes, Ind. Code 33–4–5–1 *et seq.* and Ind. Code 33–15–22–1, and in the decisions of our Supreme Court applying these statutes or similar provisions enacted by the Legislature. By way of background to his particular contentions,

4. New names were added pursuant to court order. However, there also was evidence tending to suggest no specific court order had been timely and appropriately recorded in the court's order book on some occasions when names were added, including the instances in which names were deposited in June, 1975 and November, 1975. In this regard, we note there was testimony by a deputy clerk for Tippecanoe County that at some uncertain time, she inserted into the order book two new pages based on informal entries in the judge's file pertaining to the deposit of names during these months. These new pages were numbered "363A" and "434A," and were added because

the deputy clerk realized, in response to an inquiry regarding the orders, that "something should have been in [the book]" reflecting the orders.

We also note that among the alleged irregularities it was contended, without contradiction, that the jury box was not well-shaken when the names for Wireman's grand jury were actually drawn.

5. This practice is no longer followed in Tippecanoe County, in that voter registration records are now used which do not indicate such political affiliations.

we note IC 33–4–5–2 provides in pertinent part:

"Said commissioners shall immediately, from the names of legal voters and citizens of the United States on the latest tax duplicate and the tax schedules of the county, examine for the purpose of determining the sex, age and identity of prospective jurors, and proceed to select and deposit, in a box furnished by the clerk for that purpose, the names, written on separate slips of paper of uniform shape, size and color, of twice as many persons as will be required by law for grand and petit jurors in the courts of the county, for all the terms of such courts, to commence with the calendar year next ensuing. Each selection shall be made as nearly as possible in proportion to the population of each county commissioner's district. In making such selections, they shall in all things observe their oath, and they shall not select the name of any person who is not a voter of the county, or who is not either a freeholder or householder, or who is to them known to be interested in or has cause pending which may be tried by a jury to be drawn from the names so selected.…" [6]

Once the names of prospective jurors have been so selected, it is provided in IC 33–15–22–1 in part that

"[t]he clerk, having first well shaken the box, shall open the same in his office, and in the presence of the jury commissioners he shall publicly draw therefrom such number of names of competent persons as the judge of such court shall have ordered to be summoned as prospective jurors for such court."

Finally, IC 33–4–5–3 states that if the names in the box have been exhausted, the circuit court or judge shall "by order" direct the commissioners to deposit additional names selected in the manner provided in IC 33–4–5–2, from which group of additional names the clerk will draw new jurors.

Wireman contends, in essence, these statutory procedures were not appropriately followed and the grand jury was thus illegally constituted. In response, the State argues merely that even if such irregularities did occur, it is incumbent upon Wireman to show "prejudice" or "bad faith" with respect to the irregularities, citing *Holland v. State*, (1976) 265 Ind. 216, 352 N.E.2d 752; *Flowers v. State*, (1956) 236 Ind. 151, 139 N.E.2d 185; and *Anderson v. State*, (1941) 218 Ind. 299, 32 N.E.2d 705.

We cannot agree with the State's formulation of the rule regarding this threshold aspect of Wireman's appeal. It is true, as the State alleges, that such a showing of harm is required where there has been a *substantial compliance* with the appropriate procedures and the errors alleged appear to have been of only a technical or minor nature, such as in the cases cited by the State and in *Shack v. State*, (1972) 259 Ind. 450, 288 N.E.2d 155 (commissioners appointed in December rather than November as required by statute) and in *Leonard v. State*, (1968) 249 Ind. 361, 232 N.E.2d 882 (failure to draw names of prospective jurors for both grand and petit juries at the same time). It is equally clear, however, that a different rule pertains where compliance has not been substantial, as our Supreme Court has recently asserted in *Cross v. State*, (1979) Ind., 397 N.E.2d 265, 267–68, as follows:

"When a defendant fails to show lack of substantial compliance with statutory requirements, this Court will require a showing of prejudice to the defendant's rights. *Shack v. State, supra; Leonard v. State*, (1968) 249 Ind. 361, 232 N.E.2d 882. *However, when there is a lack of substan-*

---

**6.** The "oath" referred to in this statute requires of each commissioner that he swear or affirm he

"will honestly, and without favor or prejudice, perform the duties of jury commissioners during your term of office, that, in selecting persons to be drawn as jurors, you will select none but the persons whom you be-

lieve to be of good repute for intelligence and honesty, that you will select none whom you have been or may be requested to select, and that, in all of your selections, you will endeavor to promote only the impartial administration of justice."

IC 33–4–5–1.

*tial compliance, the defendant need not show actual prejudice.*

'It seems to us that the proper construction is to hold that an accused, regardless of his guilt or innocence, has the right to insist that there be substantial compliance with [the statute], and if these provisions are not substantially complied with, his substantial rights are harmed.['] *Rudd v. State,* (1952) 231 Ind. 105, 111, 107 N.E.2d 168, 170.

Furthermore, Judge Emmert noted that:

*'The only way this court has to enforce substantial compliance with the statutes on juries is to reverse when the issue is properly presented in the trial court and here.'* 231 Ind. at 113, 107 N.E.2d at 171." (Emphasis added.)

*See also State ex rel. Burns v. Sharp,* (1979) Ind., 393 N.E.2d 127, 130, where it is stated "a grand jury which is not organized *substantially* in accordance with the statutory requirements is held to be an unlawful jury, and an indictment returned by such a grand jury will be dismissed." Accordingly, the appropriate question for this Court on appeal, since Wireman has not alleged any demonstrable prejudice or bad faith by the practices employed, is whether there has been a "substantial compliance" with the appropriate procedures.

We conclude there has been no substantial compliance in the case at bar. Significantly, our conclusion in this regard recognizes it was apparently the intention of the Legislature, in enacting the category of legislation pertinent to the instant case, "to provide for the selection of non-partisan and impartial jurors," *Owen v. State,* (1979) Ind., 396 N.E.2d 376, 379, and that

"[o]ur statutory method for drawing juries was devised for the purpose of putting selection beyond suspicion of advantage of favoritism and making the selection, as nearly as possible, random."

*Id. See also State v. Bass,* (1936) 210 Ind. 181, 184, 1 N.E.2d 927, 928, where it is concluded "the impartiality of juries must be above suspicion in so far as a compliance with the statutory method of selection can make it so."

Numerous decisions of our courts provide guidance in applying the relevant statutes to the case at bar to determine if compliance has been substantial. In general, the tenor of these decisions has been to view a particular alleged irregularity in the context of the factual setting and any other irregularities which may have occurred in the selection process, rather than to emphasize the isolated significance of any one defect in the process. *See generally Cross v. State, supra; Rudd v. State,* (1952) 231 Ind. 105, 107 N.E.2d 168; and *State v. Bass, supra.*

With reference to these decisions, we observe at the outset it is not necessarily defective to employ voter registration records, as opposed to the tax records specified in IC 33–4–5–2, *supra,* for the purpose of obtaining a pool of names for prospective jurors. In *State ex rel. Brune v. Vanderburgh Circuit Court,* (1971) 255 Ind. 505, 265 N.E.2d 524, our Supreme Court announced a "limited" overruling of the rule expressed in *State v. Bass, supra,* in which earlier case it was stated the statute then in effect "contemplates that no names shall be contained in the jury box, except the names taken from the tax duplicate by the jury commissioners to serve the courts for the current year." *State v. Bass, supra* 210 Ind. at 184, 1 N.E.2d at 928.[7] The *Brune* Court permitted voter registration records to be used under certain prescribed circumstances. Indeed, our Legislature has provided, for example, that in certain counties, the scheme for selecting prospective jurors shall utilize a "master list" of voter registration records. *See* Ind. Code 33–4–5.5–7, concerning counties with a population between 500,000 and 600,000 persons.

---

**7.** That case did not involve the use of voter registration records or any similar alternative to the use of tax records for obtaining names, although it did present a situation in which

"there were names in the jury box which should not have been there." *State v. Bass, supra* at 184, 1 N.E.2d at 928.

Significantly, however, the Court in *Brune* also suggested, in its limited holding, that the *nature* of the voter registration records utilized may constitute one factor in deciding whether there has been a substantial compliance with the policy of obtaining an "impartial" and "nonpartisan" jury. That Court's ultimate conclusion was:

"We therefore hold that the master voters registration list arranged in alphabetical order *without any reference to political affiliation* with selections by wards and townships within the county commissioner's districts is the most comprehensive list available for utilization by the jury commissioners of Vanderburgh County for the ensuing year of 1971. The petition for an alternative writ of mandate is hereby denied." (Emphasis added.)

*State ex rel. Brune v. Vanderburgh Circuit Court, supra* at 513–14, 265 N.E.2d at 529.[8] As noted above, the instant case concerned a situation in which the subject matter for the grand jury's consideration involved distinct political overtones, and in which the evidence revealed the lists used to select names present in the box from which Wireman's grand jury was selected were "plainly" labeled according to political party affiliation. Under the circumstances, we believe such situation is at least one factor to be considered in deciding whether compliance with the statutes was substantial.

Other irregularities which may be viewed in conjunction with the above departure from IC 33–4–5–2, *supra*, and the standards enumerated in *Brune* have been further identified by our Supreme Court in the significant case of *Rudd v. State, supra*, where the Court determined the appellant, who had been indicted and found guilty of second degree murder, was entitled to a reversal of his conviction because "clear statutory provisions were disregarded concerning the selection and placing of names in the jury box, the security provisions for keeping the jury box locked, the drawing of names for jury service, and the calling of

such persons for grand jury service." *Rudd v. State, supra* 231 Ind. at 107–108, 107 N.E.2d at 169. Among the factors emphasized by the Court in that case were the following irregularities regarding the selection and placing of names in the jury box:

"The jury box was not emptied during the last term of court for 1948 before more names were placed therein for jury service for the next calendar year, as required by § 4–3304, Burns' 1946 Replacement. *State v. Bass*, 1936, 210 Ind. 181, 184, 1 N.E.2d 927. Both jury commissioners obtained the names from the tax schedules in the county assessor's office, but neither did so in the presence of the other at any time, and it must be inferred that these names were placed in the jury box by each without the other being present. This was a violation of § 4–3304, Burns' 1946 Replacement." *Id.* at 108, 107 N.E.2d at 169.

The Court also noted that contrary to the provisions of the appropriate statutes, the jury commissioner from one political party was not present or notified when the grand jury names were selected from the box, nor did the proper commissioner retain the jury box key, which instead was held by the clerk. In addition, various names which were drawn from the box were stricken without a court order, and for unexplained reasons, one juror whose name was drawn was not called for service. Significantly, the Court observed that irrespective of any lack of showing of bad faith, fraud, or corruption, the conviction must be reversed because there was no substantial compliance with the appropriate statutory procedures. *Rudd v. State, supra* at 109–110, 107 N.E.2d at 170.

As we have already observed in this regard, the selection process used to form Wireman's grand jury was similarly defective in that it involved, in combination with the use of politically-labeled voter lists, the further circumstance that the commissioners who chose the names to be placed into

---

8. We note, in this context, that in *Brune* such exception to the statute was apparently recognized solely for the purpose of avoiding the arbitrary and illegal exclusion of classes of citizens from jury service due to deletions of names, pursuant to law, from the tax records.

the box did so *individually* on many occasions, so that, as in *Rudd*, it appears neither commissioner selected the names while "in the presence of the other at any time." As noted in *Rudd*, this practice violated the provision of the relevant statute, here IC 33–4–5–2, that the commissioners "select" the names in concert. Unlike the situation in *Rudd*, it is true that in the instant case the names were *placed* into the jury box with both commissioners being present. However, as in *Rudd*, the names were *obtained* in a manner which could subvert the underlying policy of providing for the "impartial" and "non-partisan" selection of jurors, *Cross v. State, supra*, and we do not believe such defect could be cured under the circumstances merely by insuring that each of the politically-partisan commissioners,[9] along with the clerk, supervised the actual placing of the names into the box or drawing them therefrom. Such procedure does not insure a substantial compliance with the statute. Instead, we conclude that IC 33–4–5–2, as interpreted by the reasoning in *Rudd* pertaining to a virtually identical statute, requires the names will be selected by the commissioners acting in concert, and that where such practice has improperly been ignored, it may be an additional factor to consider in deciding whether compliance with the statutory method of selection has been substantial.[10]

Similarly, we also find it significant in the case at bar, as in *Rudd v. State, supra*, and as is indicated in the passages from that opinion already quoted herein, there was uncontradicted evidence the jury box was not purged of old names during the previous court term, and indeed, for as

much as six years preceding the drawing of Wireman's grand jury. As noted earlier, there was testimony by one jury commissioner, Ebner, that during his six years of service ending in December of 1975, he had never had occasion to completely empty the box, and, similarly, commissioner Brown merely asserted that in 1974, he thought the box was only emptied down to three or four names. Apart from the criticisms of this practice already expressed in *Rudd v. State, supra*, where a similar irregularity was found to be a violation of the appropriate statute, we find it significant that at the very least such a procedure may result in a jury which is not, "as nearly as possible, random," *Owen v. State, supra*, because some names may appear in the box more than once so as to increase the likelihood those names would be drawn rather than others. This practice does not, we believe, place the selection process "beyond suspicion of advantage or favoritism," *Owen v. State, supra*, at least when combined with the other irregularities noted above. *See also State ex rel. Burns v. Sharp, supra* (reversed because the commissioners selected names from a telephone directory of persons known to them to be honest and intelligent, without proper reference to the population of different county commissioners' districts, and placed those names on slips of paper which were not uniform in size or color) and *Cross v. State, supra* (motion to dismiss granted because the trial court received a list of names, *not drawn from a jury box*, of prospective jurors arranged in alphabetical as well as geographical order, which the jury commissioners had

---

9. *See* IC 33–4–5–1, which provides, in part: "[t]he circuit court shall, during the month of November, appoint for the next calendar year two [2] persons, at least one [1] of whom shall be a resident of the town or city in which the court shall be held, as jury commissioners, who shall be freeholders and voters of the county, *well known to be of opposite politics....*" (Emphasis added.)

10. In this regard we note that under appropriate circumstances recognized by the Court in *Owen v. State, supra*, such practice would not appear mandatory in all cases. The Court observed, for example, that pursuant to the lan-

guage of Ind. Code 33–5–40–18, pertaining to the duties of jury commissioners for the St. Joseph Superior Court:

"If at any time a jury shall not be drawn, then *the clerk of the court* shall select from among the properly qualified residents of such county a jury for such term who shall *be summoned and considered in all things as a regular panel of the court*. The court may call one or more juries during any one term, and may by rule provide for how long any jury shall sit." (Emphasis added.)
IC 33–5–40–18.

compiled by selecting every tenth name from voter records in which the names were arranged in such order).

Thus, we conclude that where, as here, there are numerous jury selection irregularities alleged in a politically-colored investigation, and that among such irregularities it is demonstrated the names for the grand jury in question had been drawn from a jury box which had not been purged for as many as six years, that during most of this six-year period names were chosen from politically-labeled voter lists, and that in selecting the names comprising the pool of prospective jurors the commissioners acted not in concert, but entirely on their own, substantial compliance with the appropriate statutory procedures has not been achieved.

In this regard, we find distinguishable several Supreme Court cases in which the defects alleged appeared to have been of a relatively minor or technical nature, without apparent impact on the random, impartial and non-partisan selection of jurors. Thus, in *Owen v. State, supra*, for example, there was no suggestion of any manner in which a jury would be arbitrarily or improperly constituted merely because, contrary to the special statute pertaining to the St. Joseph Superior Court,[11] two commissioners of opposite political parties rather than four were involved in the selection of names. And further, the Court emphasized "[t]here is no showing here that the jury commissioners did not in all respects follow the dictates of the statutes in their selection of jurors." *Id.* at 379. As we have already noted herein, the same kind of technical defect was present in *Shack v. State, supra*, where the commissioners were appointed in December rather than November, and in *Leonard v. State, supra*, where there was a failure to draw the names of prospective jurors for both the grand and petit juries at the same time.

Although the State also cited as authority for our review the decisions in *Flowers v. State, supra, Holland v. State, supra* and *Anderson v. State, supra*, we find each of these cases to be readily distinguishable from the instant situation. In *Flowers*, for example, the only apparent irregularity was that the grand jury was drawn one hour earlier than it should have been pursuant to the appropriate statute, a circumstance which our Supreme Court concluded would not substantially affect the defendant's rights. Similarly, in *Holland*, there was merely an allegation (without any proper showing) that grand jurors were not called for service in the order in which their names were drawn, combined with the fact the clerk did not certify to the drawing of the grand jurors' names as provided by statute. This latter irregularity was also present in *Anderson*, where the clerk failed at the time of a first drawing (when two jurors were selected) to enter the names which were drawn into his order book, then failed to give a full two days' notice under the appropriate statute before a second drawing of four names and, finally, delayed for a few days in making his entry regarding a third drawing at which two additional jurors were selected. In none of these situations did there exist the opportunity manifest in the case at bar (where the evidence was uncontradicted old names were not removed from the jury box and that many names were selected by the commissioners acting on their own, drawing from politically-labeled voter lists), for the jurors to be selected in other than a random, impartial, and non-partisan manner.

We reverse and remand with instructions to grant Wireman's motion to dismiss his indictment.

YOUNG, P. J. and CHIPMAN, J., concur.

---

11. *See* IC 33–5–40–18, quoted in part, *supra* note 10.