GREGORY HEWITT *v.* STATE OF INDIANA.

[No. 972S125.  Filed August 22, 1973.  Rehearing denied
September 22, 1973.]

---

*Franklin E. Breckenridge,* of Kokomo, for appellant.

*Theodore L. Sendak,* Attorney General, *Wesley T. Wilson,* Deputy Attorney General, for appellee.

GIVAN, J.—The appellant was indicted by the Grant County Grand Jury for first degree murder. Trial by jury resulted in a conviction as charged. Appellant was sentenced to imprisonment for life in the Indiana State Prison.

The record shows the following evidence:

Harold Bruss was a taxicab driver for the Bee Line Cab Company in Marion, Indiana. At about 9:00 P.M. on May 22, 1971, Mrs. Ethel Neese, radio dispatcher for the company, directed Bruss by radio to pick up a passenger at Eleventh and Washington Streets. A few minutes later Bruss reported to Mrs. Neese that he could not locate his fare. That was the last contact Bruss had with the cab office.

When he failed to respond to radio calls, other employees of the company began a search for Bruss.

Carol Van Buskirk, who was also a dispatcher for the company, and her husband, Joseph Van Buskirk, who was a mechanic for the company, joined in the search. They found the cab with its dome light burning and Bruss slumped behind the wheel near the old Ballard Packing Building.

Police were summoned and further investigation revealed that Bruss had died from two bullet wounds in the head. Two slugs were recovered, one from the cab and one from Bruss' skull. Each was determined to be approximately .38 caliber.

Prior to his death, Bruss was known to have had approximately $80 of his own money in his possession and, in addition, several dollars of the company money.

After the discovery of his body, his empty billfold was found in a parking lot behind Trice's Pool Room.

Mr. and Mrs. Robert Hanes were driving in the vicinity of Tenth and Washington Streets at approximately the same time Bruss made his last radio communication to the cab company. There they observed a Bee Line taxicab, whose driver fit the description of Bruss, stop in response to a flagging signal from a black man, who then entered the cab. The man they observed entering the cab was dressed as the defendant was later found to be dressed that night. This same incident was also witnessed by Michael and Joyce O'Bannion, who were driving a car which was beside the car being driven by the Haneses.

The man who flagged down the cab was described as being at least 5 feet 11 inches tall and weighing about 180 to 190 pounds.

Lowell Jackson, Jr., a friend of the appellant, recalled that between 8:30 and 9:30 on the night in question, appellant approached him in the parking lot behind Marshall's Tavern and asked for a ride to Chuck's Tavern. Between 9:30 and 10:00 P.M. Henry Butler saw the appellant on the corner in front of Chuck's Tavern, where appellant got in Butler's car and accompanied him to the parking lot. As they were

getting out of the car, Butler noticed appellant had a gun, which he believed to be a .38 caliber, stuck in the waist-band of his pants. Butler persuaded the appellant to leave the gun locked in the trunk of the car. They then walked to Trice's where appellant asked Butler for the keys to his car so he could get his gun. In less than one hour, he returned and gave the keys back to Butler. Butler did not see the .38 again, but as they were leaving Trice's appellant showed Butler a .25 caliber gun which he had just bought.

Quentin Pettiford, chief of detectives of Marion, is a counsin of the appellant. A few days after Bruss' death, Pettiford received word that the appellant had a .38 caliber gun. He sent word to the appellant that he would like for him to come to police headquarters to talk with him. In response to this request, the appellant appeared at the police station. When Pettiford entered the room where appellant was waiting, the appellant said, "Cuz, what are they trying to do to me?"

Pettiford answered, "Greg, they're not trying to do anything to you. All I wanted to know is where your 38 is at."

The appellant replied, "I know you're trying to get me for being in that cab. You've got my fingerprints."

"What cab, Greg?" asked Pettiford, to which the appellant replied, "The one the dude was shot in."

At that point, Pettiford stopped the appellant and said, "Greg, you don't have to say anymore to me unless you want to—unless you have an attorney."

At that point Pettiford directed another officer present to read the customary "Miranda warnings." The warnings were first read to the appellant, and then he was asked if he would sign the warnings. This he refused to do.

Pettiford then asked the appellant if he was willing to talk.

Appellant answered, "Yes, I'll talk to you, but I'm not going to sign my name to anything."

Appellant was then given a pad of paper on which he wrote an account of the events of the evening. In this account he admitted talking to Bruss, but stated that someone else flagged him down and left in the cab with the driver. Upon further questioning the appellant told Pettiford that he had been having spells; that he did remember getting into the cab, but he then blacked out, and that when Lowell Jackson took him to Chuck's he reached in his pocket for money to pay Jackson and found Bruss' billfold, which he later threw away behind Trice's.

A search of appellant's room revealed the .25 caliber automatic and the clothing the appellant stated he had worn that night. The .38 caliber gun was not found. There was a bloodstain on the left side of the jacket which appellant claimed to have worn that night.

Appellant first stated that he had sold his .38 caliber pistol, but later told Detective Sergeant Curis Simpkins that after the murder he had walked to the Branson Street Bridge and thrown it into the river. Police conducted a search in the river at that location but failed to recover the pistol.

Appellant first claims the trial court erred in permitting Carol Van Buskirk to testify. The court had previously ordered a separation of the witnesses. However, during her testimony the following questions and answers were given:

"Q. Did your husband tell you to get your time straight because we were really going to give you a hard time about it? Do you remember your husband telling you that?

"A. Yes, he told me to get my time straight.

"Q. And have you got it straight?

"A. As near as I can figure."

The appellant objected to any further testimony by Mrs. Van Buskirk on the ground that she had violated the court's order of separation of witnesses by talking with her husband, who had previously testified in the case. The trial court overruled this objection.

Appellant concedes that it is within the discretion of the trial court as to whether or not a witness should be permitted to testify upon a showing of a violation of the separation of witnesses. In the case at bar, there is no indication whatever that the State procured or planned in any way for Mr. and Mrs. Van Buskirk to discuss their testimony. In fact, there is no indication that Mr. Van Buskirk related in any way the nature of his testimony to his wife, nor is there any indication that he told her what to say. At the most, it is a showing of a mere admonition by him to his wife that she should have her facts straight. This record does not disclose any misconduct on the part of either Mr. or Mrs. Van Buskirk. The trial court did not abuse his discretion in permitting Mrs. Van Buskirk's testimony. *McCoy* v. *State* (1960), 241 Ind. 104, 170 N. E. 2d 43.

Appellant next claims the trial court erred in admitting State's Exhibits numbered 1, 6, 7, and 9. State's Exhibit No. 1 is a video tape reel of photographs taken at the murder scene. However, this tape has not been otherwise described nor is it incorporated in the record presented in this Court. The appellant merely makes broad statements that this tape is repetitive of other pictures taken at the scene including the body of the victim, and it is thus repetitive and inflammatory to the jury.

Exhibits 6, 7 and 9 are photographs which are included in this transcript and do, in fact, depict the taxicab, the dead driver behind the wheel, and the driver's body after being removed from the cab. These photographs show the nature of the bullet wounds to the victim's head.

Appellant claims the admission of these photographs violates the rule of law stated in *Kiefer* v. *State* (1958), 239 Ind. 103, 153 N. E. 2d 899. Since the decision in *Kiefer*, this Court has been required repeatedly to pass upon the question of whether or not photographs should have been excluded from evidence because of their gruesome

nature. As pointed out in *Blevins* v. *State* (1973), 259 Ind. 618, 291 N. E. 2d 84, 34 Ind. Dec. 565, the *Kiefer* case was very limited in its application. The photographs presented in the case at bar are the usual type of photographs which we expect to see in cases of this nature. They are demonstrative of the evidence presented in the case and in no way appear to exaggerate or misrepresent the injuries suffered by the deceased.

We hold the trial court did not err in permitting these photographs in evidence.

Appellant next claims that he was denied his constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of Indiana when the trial court permitted self-incriminating statements to be introduced into evidence without a showing of a valid waiver of these rights.

We cannot agree with the appellant's statement that there was no showing of a valid waiver in this case. Appellant bases his entire conclusion upon the fact that he refused to sign a written waiver of his constitutional rights. However, this Court has never held, nor do we find it stated in any other like case in another jurisdiction, that a defendant must sign a written waiver in order to comply with the constitutional requirement that he be advised of his constitutional rights prior to any custodial interrogation as set out in *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694.

In the case at bar, when it first became apparent to police officers that appellant was about to discuss any possibility of involvement in the murder of Harold Bruss, he was immediately stopped and given the proper warnings. The fact that he refused to sign a written waiver does not nullify his voluntary statements after the giving of the warnings. The police officers in this case took every possible precaution under the circumstances. There is absolutely no evidence of any coercion

or duress of any sort. The warnings were given prior to any incriminating or exculpatory statements by the appellant.

We hold the trial court did not err in admitting the statements of the appellant into evidence.

Appellant next claims that the affidavits for search warrants issued in this case were not based upon information from an informant whose reliability and credibility were proved sufficiently for the issuance of the warrants. He claims the admission of evidence gained by these warrants constituted reversible error. In the case at bar the appellant made no pretrial motion to suppress the evidence in question nor did he make any objection when the State offered the objects into evidence. He cannot now successfully claim that the admission of such evidence was reversible error. *New* v. *State* (1970), 254 Ind. 307, 259 N. E. 2d 696, 21 Ind. Dec. 720.

Appellant contends the trial court also erred in refusing to require the State to name the informant utilized in obtaining the search warrant. Appellant cites no authority for his contention that he had a right to know the identity of such informant. In the absence of objections to the evidence obtained by use of the warrant, it would be totally useless to inquire as to the identity of the informer.

We hold the trial court did not err in refusing to require the State to identify the informer.

We find no reversible error in this case.

The trial court is, therefore, affirmed.

Arterburn, C.J., and Hunter and Prentice, JJ., concur; DeBruler, J., dissents with opinion.

### DISSENTING OPINION

DeBruler, J.—Shortly after 10:00 P.M. on May 27, Detectives Dorsey and Reagan approached and stopped the accused on the sidewalk and asked him to come to headquarters and to talk with Chief Pettiford. The accused was reluctant at

first to go, but agreed upon being coaxed by a companion. He was then placed in a marked squad car and taken to police headquarters where he was lead to the detectives' room. This room was described in the testimony as alway being locked. The accused was never left alone after his arrival. A warrant to search the accused's home for the murder weapon had been issued earlier that day at about 1:00 p.m. Simultaneous with his detention in the detectives' room, his home was being searched upon authority of the warrant issued earlier that day. The accused sat down at a desk with Detective Dorsey, and supplied him with his name, address, age, height, and weight, which the detective used to fill out an arrest report. The accused asked Dorsey what was going on. Dorsey told him that he would have to wait until Chief Pettiford came in to find out. Chief Quentin Pettiford described what occurred upon his entering the detectives' room that evening to talk to the accused:

> [Question by Prosecutor] "Excuse me, Quentin then go ahead if you would please.
> I asked him where his 38 was at, he said he didn't have it. He said, I know what you're trying to do, you're trying to get me for my fingerprints in the cab. He said I had his fingerprints in the cab and I said, what cab, Greg? He said the one the dude was murdered in. I told Sgt. Dorsey to get a waiver of rights form, I said Greg, you don't have to say anymore to me; I said till your advised of your rights. I said, you have a chance for legal counsel and Sgt. Dorsey brought the waiver over and read it to him. He asked Greg to sign it. Greg said he wasn't going to sign anything at this time. I said, well do you want to talk to us, Greg? He said, yes I'll talk to you but I'm not going to sign my name to anything."

The first advice of rights and refusal to sign occurred at 11:10 p.m. The testimony further establishes that the accused continued to converse with Chief Pettiford giving a somewhat confused and conflicting description of the events of the day of the killing and at about 11:52 p.m. gave Pettiford a short one page long-hand statement. Upon receiving this state-

ment, Pettiford called in a Captain Gross who was instructed to again read the advice of rights required by *Miranda* v. *Arizona* (1966), 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, and attempt to get a waiver. The accused again confirmed that he understood the rights but refused to sign a waiver. Both the oral conversations with Chief Pettiford and the written statement were admitted in evidence over constitutional objection of defense counsel.

While I agree that a valid waiver may be made in other than written form, I believe the trial court erred in admitting the oral and written statements made by the accused to Chief Pettiford in this case, because under the facts of this case, the State failed in its burden to show an implied waiver of rights by the accused. In *Brown* v. *State* (1971), 256 Ind. 558, 270 N. E. 2d 751, we held inadmissible a statement given after the accused refused to sign a proffered written waiver. Here, the refusal to sign is also followed by the giving of damaging statements by the accused. In the *Brown* case, the refusal to sign was preceded by a specific invocation by the suspect of the right to remain silent and to have counsel. Standing in its stead in this case, and having in my opinion the same legal effect when considered in conjunction with the later refusal to sign a waiver, is the questioning by Chief Pettiford with its damaging response by the accused, which interrogation is admitted by the State to have occurred prior to any attempt to advise the accused in accordance with the requirements of the *Miranda* case. The first question by Chief Pettiford was: Where is your .38? The second question was: What cab, Greg? This was clearly custodial interrogation prior to an advice of rights. Once the incriminating responses of the accused were made to it, they became compelling influences to continue talking and to make further explanations. At the time the accused refused to sign the offered waiver of right, his decision was burdened by the fact that he had already made incriminating comments. And he was not told that his answers to those questions could not

be used against him. The subsequent statements made by this accused under these circumstances cannot be considered an express, knowing and voluntary waiver of rights.

I vote to reverse this judgment and order a new trial.

NOTE.—Reported in 300 N. E. 2d 94.