STATE of Indiana on the relation of Milton BURNS and Charles Reberger, Relators,

v.

William T. SHARP, Special Judge of the Clay Circuit Court, Clay County, Indiana, and the Clay Circuit Court, Clay County, State of Indiana, Respondents.

STATE of Indiana on the relation of Norval PICKETT, Jr., Milton Burns, Charles Reberger, Relators,

v.

William T. SHARP, Special Judge of the Clay Circuit Court, Clay County, Indiana, and the Clay Circuit Court, Clay County, State of Indiana, Respondents.

STATE of Indiana on the relation of Norval PICKETT, Jr., Relators,

v.

William T. SHARP, Special Judge of the Clay Circuit, Clay County, Indiana, and the Clay Circuit Court, Clay County, State of Indiana, Respondents.

No. 279S48.

Supreme Court of Indiana.

Aug. 6, 1979.

Hansford C. Mann, Terre Haute, George N. Craig, Brazil, for relators.

Theodore L. Sendak, Atty. Gen., David A. Arthur, Deputy Atty. Gen., Indianapolis, for respondents.

PIVARNIK, Justice.

On the petition of relators, we issued a temporary writ of prohibition on February 15, 1979, prohibiting the respondent court from making any further orders or conducting any further proceedings in causes numbered CR 78–63, CR 78–64, and CR 78–65, now pending in the Clay Circuit Court, until further order of this Court. We now address the question of whether a permanent writ should issue.

Relators, Milton Burns, Charles Reberger, and Norval Pickett, Jr., were charged with criminal acts in the above causes by way of indictments returned by a grand jury of the Clay Circuit Court. Relators filed Motions to Dismiss, alleging that the grand jury was improperly selected by the jury commissioners. Those motions were denied, and this action followed. Relators contend that the commissioners failed in every respect to comply with the statute governing the selection of grand and petit jurors, and with the instructions of the Clay Circuit Court ordering them to make said selections.

The statute directing the manner in which jury commissioners are to select jurors is Ind.Code (Burns 1975) § 33–4–5–2, which provides as follows:

*Selection of grand and petit jurors—Special procedure in counties exceeding 650,000 population.*—Said commissioners *shall immediately,* from the names of legal voters and citizens of the United States on the latest tax duplicate and the tax schedules of the county, examine for the purpose of determining the sex, age and identity of prospective jurors, and proceed to select and deposit, in a box furnished by the clerk for that purpose, the names, written on separate slips of paper of uniform shape, size and color, of twice as many persons as will be required by law for grand and petit jurors in the courts of the county, for all the terms of such courts, to commence with the calendar year next ensuing. Each selection shall be made as nearly as possible in proportion to the population of each county commissioner's district. In making such selections, they shall in all things observe their oath, and they shall not select the name of any person who is not a voter of the county, or who is not either a freeholder or householder, or who is to them known to be interested in or has cause pending which may be tried by a jury to be drawn from the names so selected. They shall deliver the box, locked, to the clerk of the circuit court, after having deposited therein the names as herein directed. The key shall be retained by one [1] of the commissioners, not an adherent of the same political party as is the clerk. [Emphasis supplied.]

The court instructed the commissioners to draw the names of 400 persons from the voters registration list, to draw the names of persons from each county commissioner's district as nearly as practicable in proportion to the population of each district, and to place the names of said prospective jurors on slips of paper of uniform size and color.

Jury commissioners Adeline Meyer and Barbara Pollom filed an affidavit with the trial court in which they stated that they were instructed by Judge Robert W. Neal as to their duties regarding the selection of names for prospective jurors for 1978, and

were ordered by him to obtain the names of 400 persons for such duty. Mrs. Meyer and Mrs. Pollom further stated in their affidavit that they each compiled a list of 200 names of persons residing in different areas of the county whom they believed to be of good repute for intelligence and honesty. They obtained the telephone numbers and addresses of these prospective jurors from telephone directories and elsewhere. One made her list on yellow tablet paper, the other on white tablet paper.

The commissioners then met with circuit court clerk Helen White and checked the names previously selected against the official voter registration list in the clerk's office, discarding names of persons not registered as voters and adding names of other individuals. Additional names were verified and selected from the voter registration list. Because the hour was late and the clerk's office was about to close, the clerk and commissioners left the remaining names on the yellow or white paper, cut them apart from the total page, folded them, and put them into the jury selection box. Each strip of paper contained only one name from the list, and all were approximately the same size.

Helen White filed two affidavits in which she stated that when the jury commissioners came to her office, one commissioner had written names of prospective jurors on yellow tablet paper, and the other had written the names on white tablet paper. It was also Mrs. White's understanding from the commissioners that the names written on the paper were taken from a telephone directory. The names were then checked in the clerk's office against the voter registration rolls to determine that they were registered.

Mrs. White stated further that, according to the 1970 census, the population of the first commissioner's district is 16,500; the population of the second district is 3,522; and the population of the third district is 4,406. The respective proportions of the total county population are as follows: first district, 67.54 per cent.; second district, 13.-59 per cent.; third district, 18.03 per cent.

Of the first 351 names drawn from the original 400 selected, 185 were from the first district, 39 from the second, and 127 from the third. Based on the 351 figure, 52.4 per cent. of the names drawn were from the first district, 11.1 per cent. were from the second district, and 36.18 per cent. were from the third district. Mrs. White stated that the first 351 names were used as a base because after that number was drawn, an additional 70 names were selected from the voter registration list by the commissioners and placed in the box with the 49 names remaining from the original 400 names. The percentages pertaining to the 49 names remaining from the original selection, therefore, cannot be calculated. After these names were all put into the selection box, Mrs. White then drew therefrom the 18 names that composed the grand jury list from which the grand jury in question in these causes was selected.

It is readily apparent that relators' argument is well taken. The commissioners were instructed to draw the names of 400 persons from the voter registration list. Instead, they obtained the names of 400 potential jurors from those persons "whom we believed to be of good repute for intelligence and honesty from different areas of the county, and obtained their telephone numbers and addresses from telephone directories and elsewhere." They were ordered to draw the names of persons from each county commissioner's district as nearly as practicable according to the population proportions of the districts. In fact, the percentage of the names drawn that were from the third district was more than twice as great as the population percentage of that district. The statute required that they place the names in the jury selection box on slips of paper of uniform size and color. They, in fact, placed in the selection box some names on yellow paper and some names on white paper, and those drawn from the box for the grand jury in question were on yellow paper and white paper. Thus, it cannot be said that there was a random and impartial selection of jurors. We cannot say that there is even an infer-

ence that there was a random drawing from a cross-section of the community. The method of the commissioners here was to select those persons known *to them* to be honest, intelligent and of good repute. Stated conversely, everyone in the county who was not, in the personal opinion of these commissioners, honest, intelligent and of good repute, was excluded. This procedure was totally arbitrary and fails to measure up to the applicable standards of review.

■■■ When there has been substantial compliance with the statutes directing the selection and calling of jurors, minor irregularities usually will not create prejudice to the defendant's rights. *Shack v. State,* (1972) 259 Ind. 450, 288 N.E.2d 155. A completely random selection of jurors is not required so long as the system used is impartial and not arbitrary. *Id.* at 459–60, 288 N.E.2d at 162. *See Taylor v. State,* (1973) 260 Ind. 264, 295 N.E.2d 600, *cert. denied,* (1973) 414 U.S. 1012, 94 S.Ct. 377, 38 L.Ed.2d 250. However, complete impartiality in the selection system in fact should be sought, and the more random the process, the less will be the appearance of arbitrariness. "The major requirement should be that the system of selection is not arbitrary . . . ." *Shack v. State,* (1972) 259 Ind. 450, 459–60, 288 N.E.2d 155, 162. Obviously, jury commissioners must be vested with a certain amount of discretion. *See Harrison v. State,* (1952) 231 Ind. 147, 106 N.E.2d 912. *See also State ex rel. Brune v. Vanderburgh Circuit Court,* (1971) 255 Ind. 505, 265 N.E.2d 524. Nevertheless, a grand jury which is not organized *substantially* in accordance with the statutory requirements is held to be an unlawful jury, and an indictment returned by such a grand jury will be dismissed. *Rudd v. State,* (1952) 231 Ind. 105, 107 N.E.2d 168. *See State v. Bass,* (1936) 210 Ind. 181, 1 N.E.2d 927, *overruled in part, State ex rel. Brune v. Vanderburgh Circuit Court,* (1971) 255 Ind. 505, 265 N.E.2d 524.

In the present case it is clear that the jury commissioners failed to substantially comply with either the statute or the circuit court's orders. As described above, the commissioners used a completely arbitrary process for selecting the potential jurors who made up the grand jury in question. The statutory method of drawing potential jurors was designed to place the selection beyond suspicion of advantage or favoritism. The process used here wholly failed to achieve this result. Because the commissioners failed in every respect to follow the directives of the statute and the instructions of the court as to their duties and responsibilities under the statute, the grand jury was not properly and legally constituted, and its acts in returning these indictments are void. Therefore, these indictments must be dismissed.

Respondents argue that this case does not present appropriate subject matter for an original action. They claim that relators' Motions to Dismiss required the trial court to make factual determinations and exercise discretion in ruling on the validity of the jury commissioners' acts. They further point out that original actions ordinarily will not lie to control the exercise of judicial discretion. As a general rule, this proposition is obviously correct, and we do not detract from the vitality or question the validity of this rule. However, we do not believe the above-cited proposition is completely determinative of the issue.

■ We have held that mandate and prohibition will lie where there is a clear legal duty to act and the lower court has failed to perform that duty. *State ex rel. Winkler v. Marion Superior Court, Room No. 3,* (1967) 248 Ind. 424, 229 N.E.2d 648; *State ex rel. Socony Mobil Oil Co. v. Delaware Circuit Court,* (1964) 245 Ind. 154, 196 N.E.2d 752; *State ex rel. Reiman v. Kimmell,* (1937) 212 Ind. 639, 10 N.E.2d 911. Furthermore, "[e]mbedded in the law governing original actions . . . is the principle that a full and adequate legal remedy by way of appeal forecloses the right to extraordinary equitable relief by way of mandate or prohibition. [Citations omitted.]" *State ex rel. Crumpacker v. LaPorte Circuit Court,* (1975) 264 Ind. 27, 338 N.E.2d 261. Thus, we noted in *State ex rel. Sendak v. Marion*

 

*Superior Court, Room No. 2,* (1978) Ind., 373 N.E.2d 145, 147–48, that actions for writ of mandate and prohibition are confined to " 'cases of clear and · obvious emergency where the failure of this court to act would result in substantial injustice.' *State ex rel. Gibson General Hospital v. Warrick Circuit Court,* (1966) 247 Ind. 240, 244, 214 N.E.2d 655, 658." The case before us presents a situation in which substantial injustice will result if this court does not intercede.

■ In this case, the jury commissioners' manner of selecting the list of potential grand jurors clearly contravened both the statute and the trial court's orders. The grand jury which resulted was therefore without question an unlawful jury. *See Rudd v. State,* (1952) 231 Ind. 105, 107 N.E.2d 168. The trial court, upon discovery of this *total* lack of compliance, was bound to dismiss any indictments returned by a grand jury which was selected in such a grossly arbitrary manner. We do not believe the respondent trial court in this case had any discretion to act otherwise.

■ It is fundamental that whether equitable relief may be obtained by way of extraordinary writ rests largely in the discretion of this Court. *State ex rel. Bicanic v. Lake Circuit Court,* (1973) 260 Ind. 73, 292 N.E.2d 596. If this Court were to refuse to act in this case, relators would be forced to defend against criminal charges arising out of indictments which were returned by an unlawful jury and which would surely be dismissed on appeal. In such an obvious case, this Court should not refrain from asserting its jurisdiction at this time and require the parties to use the normal appellate processes. We do not believe that, in this situation, relators have an adequate legal remedy available to them.

We emphasize again that this is not a case in which the trial court must be vested with wide discretion in determining factual questions or legal issues. The normal appellate process is much better suited to deal with that type of case, and in such cases parties should not expect to gain relief through the extraordinary writ process. As we stated earlier, our holding in this case does not in any way affect or call into question the strict standards by which we judge whether an extraordinary writ is the appropriate remedy in a given case.

The temporary writ of mandate and prohibition is made permanent, and the respondent trial court is ordered to expunge the record overruling relators' Motion to Dismiss causes CR 78–63, CR 78–64, and CR 78–65, and to enter an order granting said Motion.

All Justices concur.