Lewis T. **WIREMAN**, Appellant,

v.

**STATE of Indiana, Appellee.**

No. 382S118.

Supreme Court of Indiana.

March 26, 1982.

Susan Carpenter, Public Defender, David P. Freund, Deputy Public Defender, R.

Davy Eaglesfield, III, Sp. Asst. Public Defender, Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Deputy Atty. Gen., Indianapolis, for appellee.

## ON PETITION TO TRANSFER

PIVARNIK, Justice.

This cause comes to us on a petition to transfer from the Court of Appeals, Fourth District. Appellant-defendant Lewis T. Wireman was convicted of theft and first degree burglary in the Superior Court of Tippecanoe County on May 26, 1977. The Court of Appeals reversed the conviction of Wireman, finding that the jury commissioners had failed to substantially comply with the relevant statutes for selection of prospective grand and petit jurors from which the grand jury that returned the Wireman indictments was drawn. *Wireman v. State*, Ind.App., 418 N.E.2d 1182. Petition for rehearing was denied by the Court of Appeals on June 16, 1981. We find the Court of Appeals in error on this issue and accordingly vacate its opinion. We will further consider all other issues raised by defendant Wireman in his appeal.

Defendant listed eight errors on appeal, concerning: 1) whether there was substantial compliance with the statutes covering grand jury selection; 2) whether it was error to allow certain witnesses to testify for the State when the prosecutor had violated a witness separation order; 3) whether it was error to refuse defendant's request to inquire into a witness' sexual relationship with another witness; 4) whether inconsistent verdicts require reversal of conviction on one count; 5) whether the State complied with a proper answer to a notice of alibi; 6) whether there was sufficient evidence to secure a conviction for theft of property valued at one hundred dollars ($100) or more; 7) whether proper instructions on circumstantial evidence was given; and 8) whether the instruction convicting defendant on Counts 3 and 6 was erroneous.

 Defendant raised three additional errors but these have been waived on appeal. He contends that instruction 10 was improper but he has failed to set out instruction 10 verbatim in the argument section of his brief; in addition, objection to instruction 10 was not raised in defendant's motion to correct errors. Defendant has, accordingly, waived this issue and we will not consider it. *Miller v. State*, (1978) 267 Ind. 635, 641, 372 N.E.2d 1168, 1171; *Murphy v. State*, (1978) 267 Ind. 184, 187, 369 N.E.2d 411, 413; Ind.R.App.P. 8.3(A)(7). Defendant further alleges error concerning the denial of his tendered instruction 4. He presents no legal argument or citation of authority to support his contention that the trial court committed error by refusing this instruction. This issue has been waived. *Millar v. State*, (1981) Ind., 417 N.E.2d 1105, 1107; *Bledsoe v. State*, (1980) Ind., 410 N.E.2d 1310, 1312; Ind.R.App.P. 8.3(A)(7). Finally, defendant alleges error in the giving of the trial court's instruction 4 but he has failed to set out this instruction in the argument section of the brief. As noted above, *Miller, supra*, and *Murphy, supra*, this issue has therefore been waived.

Defendant Wireman was charged and tried on a nine-count indictment as follows: 1) first degree burglary; 2) conspiracy to commit a felony; 3) theft by obtaining control over stolen property; 4) theft by obtaining control over stolen property; 5) conspiracy to commit a felony; 6) theft by obtaining control over stolen property; 7) conspiracy to commit a felony; 8) first degree burglary; and 9) theft by obtaining control over stolen property. The jury found the defendant guilty of Count 1, Count 3, and Count 6. He was subsequently sentenced by the court to imprisonment for not less than ten nor more than twenty years on his conviction of Count 1, a term of not less than one nor more than ten years on Count 3, and not less than one nor more than ten years on Count 6.

On or about February 1, 1974, Richard Dean Smith, David Banton, and Paul Banton, broke into the home of Alvin E. Morehouse, in West Lafayette, and took coins and coin cases. Smith testified that he and David Banton had been advised by Wireman the day before the crime that Morehouse and his wife had left town and that it would be a good time to burglarize their home. He further advised them that there was a coin collection in the home. On February 8, 1974, Paul Banton and Smith burglarized the home of William R. Osborn, after again having been advised by Wireman that there was a gun collection of value in this home and that he would buy the guns if they could obtain them. Four of the antique firearms taken during the burglary of the Osborn home were subsequently found in Defendant's possession. On March 8, 1974, the trailer home of George Gourko was broken into by Smith and both Bantons. The testimony was that Wireman had given Smith and the Bantons a down payment on this job and told them there was a valuable coin collection in the home. He further informed them that Gourko was out of town. Coins from this collection were found in the possession of Lewis Wireman. Lewis Wireman was the judge of the Lafayette City Court during the time these burglaries took place.

I.

It was the opinion of the Court of Appeals that there was such a substantial lack of compliance in the selection of the grand jurors in this cause that the trial court should have granted a Motion to Dismiss. The Motion to Dismiss was heard by the trial court on April 30, 1976, and June 14, 1976, and denied in all specifications. It is not now our burden nor was it that of the Court of Appeals to re-weigh the evidence to determine if there was sufficient evidence on which to challenge the selection process of the grand jury but to ascertain if there is sufficient evidence, together with all reasonable inferences to be drawn therefrom to support the ruling. We will consider the evidence favorable only to the

State. *Kimmel v. State*, (1981) Ind., 418 N.E.2d 1152, 1158; *James v. State*, (1980) Ind., 411 N.E.2d 618, 622. The evidence shows that the clerk was Republican and the Democratic commissioner kept the key to the jury box. He never opened the box unless the other commissioner and the clerk were there. The commissioners always used the same size of white paper on which to write names to go into the box and both commissioners, as well as the clerk, were present when names were put into the box. The clerk always obtained an order from the judge for the number of names when it was necessary to replenish the box and names were drawn by the clerk or one of the commissioners and listed in the order drawn. The major filling of the box was around the first of each year. Defendant contends the basis for lack of substantial compliance of statutory requirements for grand jury selection was that some of the names had gotten into the box at a time when the jury commissioners selected names of prospective jurors from yellow voter registration cards; those cards showed voter preference as to political party. Also, the box was not totally purged at any particular time and the commissioners did not always select names in the presence of each other.

The facts showed that prior to mid-1974 or possibly early 1975, depending on the testimony of the commissioners themselves, names were selected from yellow voter registration cards which showed voter preference. This practice stopped somewhere between mid-1974 to early 1975, and after that time names were selected from registration cards which did not show voter preference. During all of this period, however, selection was made purely by chance and in a random manner by selecting every fifth or sixth name from such cards without reference to the party designation of the person being selected. This was testified to by all of the commissioners. The commissioners were business people in the town of Lafayette, Indiana, and there were times when one or the other of the commissioners

would go to the voter's list and select the names in the method they had agreed upon by going to every fifth or sixth name in a random manner through the list. Sometimes they would do this individually and sometimes they would do it when both were present. In either event, both were always present when the names were put into the box. They did not have a practice of regularly purging the box but it would be filled by court order whenever the box became low on names. There was one time, in 1974, when the box contained only three or four names and those were left in the box. Orders for the addition of names to the box were obtained by the clerk when it appeared that the number of slips in the box was getting low. In 1975, such orders were entered on January 20, 1975, for one-thousand (1,000) names; June 18, 1975, for six-hundred (600) names; August 29, 1975, for six-hundred (600) names; and November 3, 1975, for six-hundred (600) names. Names for the grand jury which returned the Wireman indictments were drawn on December 17, 1975, and on January 2, 1976.

Defendant made much of the fact that he was in a political office and claimed there was a political conspiracy that was out to "get him" and that these criminal charges were brought as a result of that conspiracy. There is no evidence whatever that the grand jury was selected in furtherance of any conspiracy or that it was handpicked in any manner to bring about a calculated result. As a matter of fact, this record does not show the political affiliation of the defendant nor does it show, in any manner, the political makeup of the grand jury. There is no fact in the record that would even give rise to an inference as to the political makeup of the grand jury that indicted this defendant. The selection of voters, from the voter registration cards which indicated voter preference, was put in the box, as we indicated above, not any later than early 1975, and possibly late 1974. This was long before any investigation of this defendant would be known to those selecting the grand jury as a special prose-

cutor was appointed to make the investigation of the defendant on October 22, 1975. This is true in addition to the fact that when voter registration cards which showed party preference were used by the jury commissioners, the same random selection was used then as was used after party preference was not apparent. Therefore, even though some of the names selected in this manner could have been in the box at the time the names were drawn to investigate this defendant, there is no evidence that the names were not selected in a random manner with no purposeful inclusion or exclusion of any group or class.

■ The test to be used is that stated in *Owen v. State*, (1979) Ind., 396 N.E.2d 376, 379:

"The major requirement should be that the system of selection is not arbitrary . . . and complete impartiality should be sought.

Our statutory method for drawing jurors was devised for the purpose of putting selection beyond suspicion of advantage or favoritism and making the selection, as nearly as possible, random."

In *State ex rel. Burns v. Sharp*, (1979) Ind., 393 N.E.2d 127, we found that the jury commissioners did not in any respect follow the statutes for selection of the grand jury. Selection there was not only made individually by the commissioners, but the names were obtained from improper sources, such as telephone directories, and names were first selected by picking particular individuals known by the commissioners and not by any random selection from a compilation of all of the residents of the community such as the voters registration lists.

The controlling statute is Ind.Code (1975) § 33–15–22–2, which reads as follows:

"Supplemental Act—Liberal Construction.—The provisions of this act [33–15–22–1—33–15–22–4] shall be construed to supplement and not to repeal the statutory provisions for special juries, for juries by agreement, for juries from other counties, for struck juries, and for special venires. This act shall be construed liberally, to the effect that no indictment shall be quashed, and no trial, judgment, order or proceeding shall be reversed or held invalid on the ground that the terms of this act have not been followed, unless it shall appear that such noncompliance was either in bad faith or was objected to promptly upon discovery and was probably harmful to the substantial rights of the objecting party."

The statutes further provide: "If at any time a jury shall not be drawn, then the clerk of the court shall select from among the properly qualified residents of such county, a jury for such term who shall be summoned and considered in all things as a regular panel of the court. The court may call one or more juries during any one term and may by rule provide for how long any jury shall sit." Ind.Code (1975) § 33–5–40–18 [Acts 1965, Ch. 266, § 19, p. 727; 1969, Ch. 306, § 4, p. 1279].

A completely random selection of jurors is not required so long as the system used is impartial and not arbitrary. Complete impartiality in the selection system should be sought and the more random the process, the less will be the appearance of arbitrariness. The major requirement should be that the system of selection is not arbitrary. Jury commissioners are vested with a certain amount of discretion, however, and a substantial following of the statutory requirements will suffice. *Owen v. State*, (1979) Ind., 396 N.E.2d 376; *State ex rel. Burns v. Sharp, supra; Taylor v. State*, (1973) 260 Ind. 264, 295 N.E.2d 600; *Shack v. State*, (1972) 259 Ind. 450, 288 N.E.2d 155; *State ex rel. Brune v. Vanderburgh Circuit Court*, (1971) 255 Ind. 505, 265 N.E.2d 524.

■ The fact that the commissioners did not always make selection of names in the presence of each other was not such a substantial failure to comply with statutory requirements that their selection resulted in

an illegal grand jury. The evidence is that the selection was made in a proper and random manner. Furthermore, the fact that the box was not purged from time to time did not present a substantial lack of statutory requirements either. There was a time in 1974 when the box contained only three or four names, which were not removed when the box was filled with new names. Defendant's contention is that because the box was not purged, the same name might appear in the box twice. This is, of course, true. It is also true that even if the box was purged and names were randomly selected, the same name could appear more than once in any one year. There was no showing here that any one name did, in fact, appear more than once and no showing as to what harm might come to this defendant if such an eventuality occurred.

■ Since the record shows that the evidence presented to the trial court indicated that the jury commissioners had substantially complied with the statutory requirements in the selection of the grand jury, the trial court properly overruled motions to dismiss based on those contentions.

### II.

■ The defendant next contends that the trial court abused its discretion by allowing certain witnesses to testify for the State when the prosecutor had violated a witness separation order by the court. The evidence showed that the prosecutor met with Laura Shepard and Phyllis Wireman on the evening of May 19, during the trial, to elicit from each witness her recollection about certain events and dates. Neither of these witnesses had testified up to that time. The witnesses testified that there had been some passage of time since the occurrence of the events and the time of the trial when dates needed to be recalled. The prosecutor was intent on confirming dates and events with each of these witnesses and had them in his office at the same time.

Phyllis Wireman testified that they did not discuss their testimony with each other but went over "piles of paper and things like that to come up with the dates" in order to fix dates and times in their minds. The State points out that although Phyllis and Laura were interviewed by the special prosecutor at the same time, there is no evidence in the record that either witness told the other what to say. Permitting a witness to testify in violation of a separation of witnesses order is a matter within the sound discretion of the trial judge and we will not disturb the exercise of that discretion unless there is a showing that there was such prejudice to the defendant that there was an abuse of discretion. *Buchanan v. State*, (1975) 263 Ind. 360, 332 N.E.2d 213; *Rogers v. State*, (1974) 262 Ind. 315, 315 N.E.2d 707; *Hewitt v. State*, (1973) 261 Ind. 71, 300 N.E.2d 94; *Johnson v. State*, (1972) 258 Ind. 648, 283 N.E.2d 532; *Maynard v. State*, (1971) 257 Ind. 336, 274 N.E.2d 396. There is no showing here that the trial court abused its discretion in overruling objections to the testimony of these witnesses.

### III.

The State filed a *motion in limine* and also filed for a protective order, which was granted by the trial court on May 18, 1977. The second paragraph of the motion requested the court to instruct the defendant not to ask questions concerning, or referring,

> "[t]o arrest or specific acts or conduct of an immoral or unlawful nature or reputation of State's witnesses, except reputation for general moral character at the time of trial on the issue of credibility of a witness and except reputation for truth and veracity at the time of trial."

During cross-examination of Mrs. Wireman, defendant made a motion "to modify the motion to limit heretofore entered for the purpose of permitting counsel to explore on cross-examination of this witness to specific areas." As it applies to this issue, defend-

ant requested of the court the right to ask Phyllis Wireman "if it isn't a fact that Laura Shepard was a competitor of Mr. Wireman's for Mrs. Wireman's sexual favors during this period." Defendant presented no legal argument in support of this Motion. The Motion was overruled by the court and defendant made no offer to prove, nor any showing to the court as to the existence of any evidence that there was a homosexual relationship between Laura Shepard and Phyllis Wireman, and that that relationship caused a competition with Mr. Wireman that would give rise to prejudice of either of the witnesses.

 It is well settled that limiting the scope of cross-examination is a function within the sound discretion of the trial judge. Only upon a showing of a clear abuse of such discretion will this Court order a reversal. *Haak v. State*, (1981) Ind., 417 N.E.2d 321, 322; *Cobb v. State*, (1981) Ind., 412 N.E.2d 728, 739. Furthermore, where defendant's objection is insufficient in form to call the trial court's attention to the accused's argument, we will not find that the trial court erred in overruling that objection. *Patterson v. State*, (1978) 267 Ind. 515, 371 N.E.2d 1309; *Wells v. State*, (1970) 254 Ind. 608, 261 N.E.2d 865. Grounds for the admission of evidence which are relied on on appeal must be the same as those urged at trial. *Swinehart v. State*, (1978) 268 Ind. 460, 376 N.E.2d 486. There is no showing that the trial court abused its discretion on this issue.

### IV.

 Defendant Wireman next contends that the inconsistency of the verdicts as to Count 1 and Count 2 of the indictment demands reversal of Count 1. Count 1 charged Wireman with committing first degree burglary of the residence of Alvin Morehouse on February 10, 1974, while Count 2 charges him with conspiring with David Banton and Richard Dean Smith to commit this same burglary. Defendant correctly points out that the indictment charged defendant as a principal while the record shows that he was tried as an accessory before the fact and that while he was not present at the time the burglary described in Count 1 was committed, he had, according to Smith's testimony, devised the transaction and advised Smith to commit the crime. Defendant Wireman then contends that the same facts necessary to show his guilt as an accessory to burglary are essential to show him guilty of the conspiracy charged in Count 2 and that since the jury found him not guilty of that conspiracy in Count 2 then his conviction for burglary in the first count cannot stand. Defendant recognizes that in Indiana, inconsistent verdicts are not grounds for reversal but asks us to reconsider our position on that issue and follow other jurisdictions that have found inconsistency to require reversal. We are not inclined to do so. *Flowers v. State*, (1942) 221 Ind. 448, 48 N.E.2d 56, this Court held:

"The better rule appears to be that declared by Mr. Justice Holmes in *Dunn v. United States* (1932), 284 U.S. 390, 52 S.Ct. 189, 76 L.Ed. 356, 80 A.L.R. 161, where it was declared:

'Consistency of the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. . . . Where the offenses are separately charged in the counts of a single indictment the same rule must hold. . . .

That the verdict may have been the result of compromise, or of a mistake on the part of the jury is possible. But verdicts cannot be upset by speculation or inquiry into such matters.' "

*Id.* at 450, 48 N.E.2d at 57. *See also Sichick v. State*, (1929) 89 Ind.App. 132, 166 N.E. 14.

We still find this rule to be sound and apply it here in affirming the trial court on this issue. There was ample evidence from which the jury could find beyond a reasonable doubt that the defendant was guilty of burglary as charged in Count 1 of the indictment.

## V.

■ Defendant next argues that the lower court erred in its ruling pertaining to the alibi statute when it refused to grant defendant's motion to strike answers to notice of alibi as to Counts 3 and 6 of the indictment. On May 6, 1977, appellant Wireman filed a pre-trial notice of alibi pursuant to Ind.Code (1979 Repl.) § 35–5–1–1. The notice specifically requested that the prosecutor serve upon the defendant a specific statement in regard to the exact dates and places where the defendant was alleged to have committed the offenses pursuant to Ind.Code (1979 Repl.) § 35–5–1–2. The State filed an answer to that motion on May 10, 1977, in which it stated that the proof at trial would show that as to Count 3, Wireman purchased the stolen guns at the Banton home sometime after February 9, 1974, and as to Count 6, the State would show "that on or about March 10, 1974, David Banton transferred the stolen property taken in the burglary of the George Gourko residence to the home of Lewis T. Wireman in a pillow case." On May 12, 1977, defendant filed a motion to strike answers to notice of alibi which was overruled as to both counts. The State filed an amended answer, narrowing the time of delivery of the stolen guns taken from the Osborn residence to within forty-eight hours following the burglary, which had occurred on February 9, 1974. Defendant himself testified to having possession of the Gourko coins on March 10, 1974, and the Osborn guns and gun case on February 10, 1974. It is the State's contention that since the defendant admitted to having possession of the stolen items on the dates set forth in the answer to the alibi statement, defendant could not in any way be harmed by the State's failure to give a more exact time. It is defendant's contention that he was charged in Count 3 of the indictment with knowingly obtaining control over stolen property. He reasons that by giving his notice of alibi to Count 3, the defendant mandated the prosecution to specify the exact date or dates of the events or circumstances that it was going to introduce at trial from which the jury could have reasonably inferred that defendant had knowledge that the guns were stolen. We do not find this argument persuasive. In the first place Wireman's Motion to Strike was general in form and did not allege an absence of good cause on the part of the prosecuting attorney in failing to make a more definite statement. *Herman v. State*, (1965) 247 Ind. 7, 17, 210 N.E.2d 249, 255. Furthermore, we do not find the inexactness in the answers of the prosecutor that were contemplated in the statutory law or in the interpretation of it by the courts. The State gave the dates and times when the crimes were committed and when acts took place in furtherance of those crimes. To require it to give an exact time and place when a mental process took place, particularly when that mental process could be inferred from the act itself, would be an unrealistic and undue burden. This Court stated in *Monserrate v. State*, (1976) 265 Ind. 153, 159, 352 N.E.2d 721, 725:

> "The purpose of the alibi statute is not to compel the exclusion of evidence or mandate retrials for purely technical errors. If the inexactness complained of did not mislead the accused in the preparation or maintenance of his defense and is not likely to place him in second jeopardy for the same offense, then reversal is not required."

The State's contention is well taken here, that the specification of a more exact time or place in its answer could not have altered the presentation of evidence by the defendant in view of the defendant's admissions as to possession of the stolen property. The court's overruling of defendant's Motion to Strike the State's answer was not an abuse of discretion so as to constitute reversible error.

## VI.

■ Defendant Wireman next claims his conviction under Count 3 was not supported by sufficient evidence. He was

charged in Count 3 with theft of property valued at $100.00 or more. It is defendant's contention that there was not sufficient evidence for the jury to find the property stolen under Count 3 was of a value of $100.00 or more. This would, of course, be determinative of the penalty to be imposed on the defendant and not the conviction for theft. Theft of property of less than $100.00 under the statutes in effect at the time of commission of this crime, Ind.Code (1975) § 35–17–5–12, carried a lesser penalty than theft of property valued at over $100.00. On questions of sufficiency of the evidence to support a conviction, of course, this Court will consider only the evidence which is most favorable to the State together with all the logical and reasonable inferences to be drawn therefrom. We will not weigh the evidence nor determine the credibility of witnesses. *Kimmel v. State*, (1981) Ind., 418 N.E.2d 1152, 1158; *James v. State*, (1980) Ind., 411 N.E.2d 618, 622.

Wireman alleges the State failed to introduce any evidence of the value of the revolver and three rifles taken from the Osborn home and charged in Count 3 of the indictment. The evidence did show, however, that four of the firearms found in the defendant's possession were antique weapons which had been manufactured in the late 1800's and early 1900's. Osborn testified that he paid $400.00 in order to buy back a portion of the weapons which had been taken during this burglary. It appears then that there were sufficient facts and inferences to be drawn from those facts from which the jury could find that the aggregate value of the stolen guns found in Wireman's possession was more than $100.00. We find no error here.

## VII.

Defendant tendered his Instructions No. 1 and 5, as follows:

### DEFENDANT'S TENDERED INSTRUCTION NO. 1

Guilty knowledge that the property received is stolen cannot rest on mere supposition and, where the state relies wholly on circumstantial evidence to show such guilty knowledge, the circumstances relied upon must point clearly *and conclusively* to guilt and exclude every reasonable hypothesis of innocence. (R. 237)

### DEFENDANT'S TENDERED INSTRUCTION NO. 5

Where the evidence necessary for a conviction is wholly circumstantial in character, it must be of such *conclusive and* persuasive force that it tends to point surely and unerringly to the guilt of the accused to an extent that it excludes every reasonable hypothesis of innocence. (R. 241).

The court gave these two instructions but deleted the underlined terms conclusively and conclusive from each of the instructions. It is defendant's contention that the court inadequately instructed the jury on circumstantial evidence by the striking of these words in the instructions and thereby committed reversible error. We do not find the instructions of the court to be inadequate by the striking of conclusively and conclusive from defendant's tendered instructions 1 and 5. Defendant relies on the opinion of this Court in *Manlove v. State*, (1968) 250 Ind. 70, 77, 232 N.E.2d 874, 878, wherein it was stated that the rule governing juries and trial courts in the trial of criminal cases is that when the evidence necessary for a conviction is wholly circumstantial in character it must be of such conclusive and persuasive force that it tends to point surely and unerringly to the guilt of the accused to an extent that it excludes every reasonable hypothesis of innocence. The evidence against defendant Wireman in this cause was not wholly circumstantial. We have already referred to evidence in which accessories to the crime testified to his participation, defendant himself having admitted to being in possession of much of the stolen property. Furthermore, an examination of the record shows that the jury was adequately instructed in all areas and

defendant does not deny this. The jury was instructed on each and every element of the crimes with which the defendant was charged. The State had the burden of proving every element of the crimes charged beyond a reasonable doubt, through the testimony of witnesses and introduction of direct and circumstantial evidence. The trial court's modifications by excising the two words did not render the instructions given to the jury inadequate in any manner sufficient to warrant this Court's awarding the defendant a new trial. *Bricker v. State*, (1975) 264 Ind. 186, 341 N.E.2d 502; *Patterson v. State*, (1975) 263 Ind. 55, 324 N.E.2d 482.

## VIII.

Finally, defendant Wireman contends the verdict of guilty on counts 3 and 6 must be set aside because the verdicts were based upon an erroneous instruction. Count 3 charged defendant with knowingly obtaining control over stolen property of William O. Osborn, knowing the property to have been stolen by another and intending to deprive the owner of the use or benefit of the property. Count 6 charged the defendant with knowingly obtaining control over the stolen property of George Gourko, knowing the property to have been stolen by another, intending to deprive the owner of the use and benefit of said property. The instruction to which defendant refers was as follows:

> "If you find beyond a reasonable doubt that the defendant obtained possession or control over stolen property, knew the property had been stolen, and intended to deprive the owner of its use and benefit as charged in Counts 3, 4, 6, and 9, then you may find the defendant guilty of such counts.
>
> Furthermore, if you find that the defendant aided or abetted another who was guilty of theft by obtaining unauthorized control over stolen property, as charged in counts 3, 4, 6, and 9, then you may find the defendant guilty of such counts."

It is appellant's contention that the second paragraph of this instruction authorized the jury to convict on count 3 and/or count 6, under a theory of aiding and abetting another who was guilty of theft by obtaining unauthorized control over stolen property without first insuring a finding that the defendant had actual knowledge that the goods were stolen. It is well settled that instructions are to be considered in their totality and not as separate units, particularly where defendant here refers to one paragraph of the total instruction. *Cobb v. State*, (1980) Ind., 412 N.E.2d 728, 742; *Lottie v. State*, (1980) Ind., 406 N.E.2d 632, 636. The court very thoroughly instructed the jury as to the burden of the State to prove each element of each of the counts contained in the indictment and in its final instruction No. 3, instructed the jury as to the elements necessary under Counts 3, 4, 6, and 9, to find the defendant guilty of the charges of theft by obtaining control over stolen property in which it was stated that the defendant must know at the time that the property had been stolen by another. We find the jury was adequately and properly instructed and no grounds are presented on this issue to justify the granting of a new trial. The judgment of the trial court is in all respects affirmed. Transfer is granted.

GIVAN, C. J., and DeBRULER, J., concur.

HUNTER, J., dissents with opinion in which PRENTICE, J., concurs.

HUNTER, Justice, dissenting.

I must respectfully dissent from the majority opinion. The Court of Appeals' decision in the instant case, found at *Wireman v. State*, (1981) Ind.App., 418 N.E.2d 1182, should not be disturbed. Based on its extensive analysis of the facts, as well as the case precedent and policy considerations surrounding the selection of jurors, the Court of Appeals unanimously and correctly concluded the manner in which Wireman's

jury was selected was not in substantial compliance with the dictates of Ind.Code § 33–4–5–1 *et seq.* (Burns 1975). In concluding otherwise, the majority has overlooked both facts in evidence and the case precedent of this jurisdiction.

As the Court of Appeals recognized, this Court has repeatedly emphasized that compliance with the statutory procedures for the selection of jury venire serves the vital purposes of guaranteeing the impartiality of jurors and eliminating any cause for suspicion about the selection process. *Cross v. State*, (1979) Ind., 397 N.E.2d 265; *Owen v. State*, (1979) Ind. 396 N.E.2d 376; *Shack v. State*, (1972) 259 Ind. 450, 288 N.E.2d 155; *Rudd v. State*, (1952) 231 Ind. 105, 107 N.E.2d 168. The former aim, of course, is constitutionally required as basic to our system of jurisprudence and the principles of law of our republic. *Smith v. Texas*, (1940) 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84; *Brewer v. State*, (1969) 253 Ind. 154, 252 N.E.2d 429. The latter purpose—removing any specter of arbitrariness from the selection process—is vital to the effective administration of justice, for it perpetuates society's confidence that the system yields convictions justly secured. *Cross v. State, supra; Brewer v. State, supra; Rudd v. State, supra.*

In response to these considerations, Judge Emmert spoke for this unanimous Court in *Rudd*:

> "It seems to us that the proper construction is to hold that an accused, regardless of his guilt or innocence, has the right to insist that there be substantial compliance with § 4–3320, Burns' 1946 Replacement, and if these provisions are not substantially complied with, his substantial rights are harmed.
>
> \* \* \*
>
> "The only way this court has to enforce substantial compliance with the statutes on juries is to reverse when the issue is properly presented in the trial court and here." *Id.,* 231 Ind. at 111–113, 107 N.E.2d at 170–71."

In the three decades since *Rudd* was decided, this Court's decisions have continued to focus on the question whether the methods employed in any particular case constituted "substantial compliance" with the governing statutes. In the spirit of *Rudd* and the aforementioned constitutional and policy considerations, a two-pronged test has evolved, as we recently reiterated in *Cross v. State, supra*:

> "When a defendant fails to show lack of substantial compliance with statutory requirements, this Court will require a showing of prejudice to the defendant's rights. *Shack v. State, supra; Leonard v. State,* (1968) 249 Ind. 361, 232 N.E.2d 882. However, when there is a lack of substantial compliance, the defendant need not show actual prejudice." *Id.,* 397 N.E.2d at 267–268.

Here, the Court of Appeals concluded the procedures employed to select the venire from which defendant's grand jury was chosen did not constitute substantial compliance with the governing statutes. Ind. Code § 33–4–5–1, *supra*. For that reason, the Court of Appeals rejected the state's contention that it was incumbent upon defendant to demonstrate actual prejudice from the various irregularities. *Wireman v. State, supra.*

The majority of this Court rejects that approach, finding the procedures substantially complied with the statutory requirements and that the defendant demonstrated no actual prejudice by virtue of the various irregularities.

The record supports the conclusion of the Court of Appeals. Therein, it is revealed it was the practice of the jury commissioners to select the venire by utilizing voter registration lists which "plainly" revealed the voting preferences of the persons listed thereon. The use of these politically-labeled lists occurred notwithstanding the availability of politically-neutered master voting lists which, as this Court has expressly recognized, satisfy the statutory requirement and purpose of Ind.Code § 33–4–

5–2, *supra. State ex rel. Brune v. Vanderburgh Circuit Court*, (1971) 255 Ind. 505, 265 N.E.2d 524.

Coupled with this impropriety, the record also reveals the jury commissioners regularly acted outside the presence of each other when selecting the names of prospective jurors from the politically-labeled lists. For obvious reasons, this practice was condemned in *Rudd*. The fact both commissioners were present when the names were ultimately placed in the box, as the majority indicates, in no way cures the impropriety. As it is pointless to lock the gate after the horse has fled, so it is meaningless the commissioners were present together to view the slips of paper bearing improperly selected names as they were dropped into the box.

In addition, the record reveals the jury commissioners failed to purge the box of names on a regular basis; instead, the commissioners simply added names whenever the box neared depletion. This practice was also condemned in *Rudd*.

The record also reveals that prior to the time when the names for defendant's grand jury were drawn, the jury commissioners abandoned use of the politically-labeled lists as the source of prospective jurors. The majority indicates this procedural change occurred "somewhere between mid-1974 to early 1975." It is true that one commissioner vacillated in his testimony regarding when the procedure changed; he stated the change might have occurred as early as mid-1974 or as late as mid-1975. Other testimony, however, was more definite. Voter registration officer Johanna Gartenhaus testified the commissioners utilized the politically-labeled lists until the middle of 1975. Likewise, jury commissioner Robert Brown stated that the last time the politically-labeled lists were employed was to fill the spring request of 1975.

That request in the spring of 1975 occurred in June, when the commissioners added 600 names to the box of prospective jurors. In January of 1975, when the main input of names for the year had occurred, the commissioners had placed 1,000 names in the box. The fact that 1,600 names drawn from the politically-labeled lists were placed in the box during 1975 renders insignificant the testimony of jury commissioner Brown that "sometime" in 1974 the box contained only three or four names.

It is significant, on the other hand, that the box was not purged of names in mid-1975 when the commissioners properly began using the nonpartisan master voting lists. Likewise, it is relevant that subsequent to the implementation of the new selection source, 1,200 additional names were added to the box prior to early December of 1975, when the names of defendant's prospective grand jurors were drawn.

We have no way of knowing the ratio of properly selected names to improperly selected names in the box at the time prospective grand jurors' names were drawn. There is no testimony to establish that fact, nor can the matter be resolved by resort to inference on the basis of the record before us.

On the basis of these facts alone, the case precedent of this Court requires the conclusion reached by the Court of Appeals. We emphasized in *State ex rel. Brune v. Vanderburgh Circuit Court, supra*, that master voting lists could be utilized in the selection of venire so long as the lists were "without any reference to political affiliation." *Id.*, 255 Ind. at 513, 265 N.E.2d at 529. We have also recognized that when the source of names for the venire is improper, a random selection therefrom does not cure the impropriety and transform the procedure into one which substantially complies with the statutory requirements. *Cross v. State, supra* (Givan, C. J., and Pivarnik, J., dissenting); *State ex rel. Burns v. Sharp*, (1979) Ind., 393 N.E.2d 127.

Other factors remain, however—factors peculiar to this case—which also require the conclusion reached by the Court of Appeals. The Court of Appeals properly acknowledged the case before us involved an inves-

tigation of wrongdoing by public officials and carried partisan "overtones." The official investigation which culminated in the grand jury's indictment of defendant was initiated by three other elected public officials, each of whom shared a political preference different from that held by defendant. Together, they called a meeting with the regularly-elected prosecutor and urged him to yield to the appointment of a special prosecutor to head the investigation and convene the grand jury. Ultimately, a special prosecutor of the same partisan persuasion as the three public officials was appointed and assumed control of the investigation.

It is true, as the majority states, that defendant has "made much" of the political aspects of the investigation and grand jury indictment. Indeed, both in his motion to dismiss and on appeal, defendant has tendered numerous arguments in that respect which the majority has erroneously failed to mention or address.[1] In addition to arguing the venire was improperly selected, defendant has also maintained his motion to dismiss should have been granted because one of the three public officials who initiated the investigation and appointment of the special prosecutor also presided over the selection of the jurors who ultimately sat on the grand jury; concomitantly, defendant has argued the grand jury was improperly impaneled in that prospective jurors were not seated for questioning in the order in which their names had been drawn, that prospective jurors were excused without legal cause, and that prospective jurors were questioned outside the presence of each other. Defendant has also maintained dismissal was warranted by virtue of irregularities in records pertaining to the selection process, by the fact a commissioner, rather than a clerk, drew the names, and by the fact the box was not shaken prior to the draw. It was this Court's duty to address these contentions. *See* n. 1, *supra.*

Just as the Court of Appeals found it unnecessary to reach the merits of these questions, so also should it be emphasized the question before us is not a partisan one. Rather, the issue is whether defendant's motion to dismiss should have been granted by virtue of the various irregularities in the selection of the grand jury which indicted him.

Nevertheless, the majority relies on the fact there was "no evidence whatever that the grand jury was selected in furtherance of any conspiracy or that it was handpicked in any manner to bring about a calculated result." *See, Majority Opinion, supra.* That analysis flies directly in the face of recognition by both this Court and the United States Supreme Court that it is not incumbent upon a defendant to establish the improper manner in which his jury was selected was a product of bad faith, fraud, corruption, or other ulterior motives. *Whitus v. Georgia,* (1967) 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; *Rudd v. State, supra; see also, Shack v. State, supra,* 259 Ind. at 463, 288 N.E.2d at 164 (DeBruler, J., concurring). Similarly, the majority has emphasized there was no evidence to indicate the "political makeup" of the grand jury which indicted him; that question is particularly inappropriate here.

It was, after all, our founding fathers' desire to eliminate the specter of convictions politically obtained which inspired the constitutional right to an impartial jury. In the face of the circumstances surrounding the case at hand, the question before us should not be reduced to a matter purely of formal partisanship; neither, however, can

1. Inasmuch as the Court of Appeals concluded the improperly selected venire warranted reversal, it expressly noted the disposition of these other arguments was not necessary to its decision. *Wireman v. State, supra* 418 N.E.2d at 1183, n. 1. Pursuant to Ind.R.App.P. 11(B)(3), it is this Court's *duty* to address these conten-

tions of defendant; pursuant to the rule, this Court assumes "jurisdiction of the appeal as if originally filed" in this Court when we grant transfer. *Id.* Defendant argued each of the contentions in the brief filed with the Court of Appeals.

the fact defendant's investigation involved public officials of opposing faiths be relegated to oblivion. Cognizant of the broader considerations underlying the facts at hand, the Court of Appeals in its final analysis refused to ignore the political aspects of the question before us. Judge Miller spoke for the unanimous Court:

"Thus, we conclude that where, as here, there are numerous jury selection irregularities alleged in a politically-colored investigation, and that among such irregularities it is demonstrated the names for the grand jury in question had been drawn from a jury box which had not been purged for as many as six years, that during most of this six-year period names were chosen from politically-labeled voter lists, and that in selecting the names comprising the pool of prospective jurors the commissioners acted not in concert, but entirely on their own, substantial compliance with the appropriate statutory procedures has not been achieved." *Wireman v. State, supra,* 418 N.E.2d at 1189.

This approach to the circumstances at hand reflects regard for the considerations underlying the statutory jury selection procedures and serves to perpetuate its purposes.

It is emphasized that no opinion is here expressed regarding defendant's claim his prosecution and conviction were politically inspired. Whether real or imagined, the *particularities* of that contention are not relevant here. At issue is solely whether defendant's grand jury was selected in a manner which substantially complied with the governing statutes and case law; in resolving that question, the guilt or innocence of defendant is also irrelevant.[2] *Rudd v. State, supra.*

When previously confronted with this issue of law, we have determined on various occasions that irregularities in the selection of a particular jury were not so significant that reversal was warranted. *See, e.g., Shack v. State, supra* (commissioners appointed in December instead of November, as statutorily required); *Leonard v. State,* (1968) 249 Ind. 361, 232 N.E.2d 882 (names of prospective grand and petit jurors not selected at same drawing); *Flowers v. State,* (1956) 236 Ind. 151, 139 N.E.2d 185 (grand jury drawn one hour earlier than statutory mandate); *Anderson v. State,* (1941) 218 Ind. 299, 32 N.E.2d 705 (clerk failed to enter names drawn and give proper statutory notice).

The circumstances of this case take it far outside the pale of the above authorities, which involved only minor irregularities. In concluding the instant facts fall within the purview of the above authorities, the majority gives an expanded and unprecedented application of the term "substantial compliance" which defeats the most fundamental considerations of the statutory authority.

In the application of the legislature's mandates regarding the manner in which jury venire are selected, our aim must not only be to insure impartiality and fairness, but, equally as important, to guard against the appearance of impropriety. With these precepts in mind, the state's petition to transfer should be denied, for to hold otherwise is to condone procedures which defeat the goals of impartiality and fairness and, at their very least, unnecessarily raise the appearance of impropriety.

The Court of Appeals properly decided the question before us. I would deny transfer; I dissent.

PRENTICE, J., concurs.

---

2. As the Court of Appeals noted, defendant was disbarred from the practice of law for improprieties related to the charges at issue.

*See In re Wireman,* (1977) Ind., 367 N.E.2d 1368.